**Misc. No. 10-57 (JRT/JJG)**

WELLS FARGO & COMPANY,

                              Petitioner,

v.

UNITED STATES OF AMERICA,

                              Respondent.

* * * * * * * * * * * * * * * * * * * * * * * *

**Misc. No. 10-95 (JRT/JJG)**

UNITED STATES OF AMERICA,

                              Petitioner,

v.

WELLS FARGO & COMPANY,

                              Respondent.

**FINDINGS OF FACT,
CONCLUSIONS OF LAW, AND
ORDER FOR JUDGMENT**

Reid M. Figel, Derek Ho, Brendan J. Crimmins, and Saritha Tice, **KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL**, 1615 M Street Northwest, Suite 400, Washington, DC 20036; Walter A. Pickhardt and Martin S. Chester, **FAEGRE BAKER DANIELS LLP**, 90 South 7th Street, Suite 2200, Minneapolis, MN 55402; and Andrew T. Gardner, **WELLS FARGO & COMPANY**, 90 South 7th Street, MAC N9305-164, Minneapolis, MN 55479, for Wells Fargo & Company.

Karen A. Smith and Robert J. Kovacev, **UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION**, P.O. Box 55, Ben Franklin Station, Washington, DC 20044; and James C. Strong, **UNITED STATES DEPARTMENT OF JUSTICE, TAX DIVISION**, P.O. Box 7238, Ben Franklin Station, Washington, DC 20044, for the United States of America.

Wells Fargo & Company ("Wells Fargo") is a diversified financial services company providing banking and other services.  It used KPMG LLP ("KPMG"), an

accounting firm, as its independent auditor for its 2007 and 2008 taxable years. The Internal Revenue Service ("IRS") issued three summonses on August 12, 2010, attempting to obtain information from Wells Fargo and KPMG related to Wells Fargo's financial reporting and its "uncertain tax positions." Wells Fargo turned over some information, but on September 1, 2010, filed a petition with this Court to quash the summons issued to KPMG, pursuant to 26 U.S.C. § 7609(b)(2). (Misc. No. 10-57, Docket No. 1.) The United States filed a counter-petition to enforce the summons against KPMG. (Misc. No. 10-57, Docket No. 7.) On December 16, 2010, the United States filed a petition, initiating a separate case, to enforce the two summonses it issued to Wells Fargo. (Misc. No. 10-95, Docket No. 1.) The parties filed a joint motion to consolidate the two cases, (Misc. No. 10-57, Docket No. 32), which the Court granted, (Misc. No. 10-57, Docket No. 34). The Court held an evidentiary hearing on this matter from July 25 to July 28, 2011. (Misc. No. 10-57, Docket Nos. 108-110, 114.)

Wells Fargo contends that it need not respond to the summonses for five main reasons: (1) the IRS had an improper purpose in issuing the summonses; (2) much of the information sought by the summonses is protected by the work product privilege; (3) eight of the documents sought are protected by the attorney-client privilege; (4) information sought about Wells Fargo's state and local tax returns are irrelevant to the IRS's audit; and (5) information about Wachovia Corporation's ("Wachovia's") financial statements and tax returns are irrelevant to the IRS's audit of Wells Fargo. On these issues, the Court will conclude, respectively, that (1) the United States has demonstrated a legitimate purpose to support its summonses; (2) certain aspects of the information

Wells Fargo seeks to withhold are protected by the work product privilege, while other information does not fall under the privilege; (3) eight documents sought by the IRS are protected by the attorney-client privilege; (4) the United States has not shown that information about Wells Fargo's state and local taxes is relevant; and (5) the United States has not shown that information about Wachovia is relevant. The Court will discuss each issue in detail below.

## FINDINGS OF FACT[1]

## IRS AUDIT AND APPEALS PROCESS

**1.** An IRS audit is an administrative investigation to determine whether a taxpayer has provided correct information and claimed the correct tax liability. (Walter Pagano ("Pagano") Tr. 438:5-11;[2] Decl. of Walter Pagano ¶ 11, Jan. 28, 2011, Docket No. 51.)[3]

**2.** The audit begins with an examination. (Pagano Tr. 439:10-16.) The IRS creates a plan for the examination and compiles information relevant to the taxpayer's return. (*See id.*)

---

[1] All of the Findings of Fact set forth herein are undisputed or have been proven by a preponderance of the evidence. To the extent that the Court's Conclusions of Law include what may be considered Findings of Fact, they are incorporated herein by reference.

[2] The Court's citations to "Tr." are to the transcript of the evidentiary hearing that took place from July 25 to July 28, 2011. (Tr. of Evidentiary Hr'g, Aug. 15, 2011, Docket Nos. 116-119.) For clarity, the Court will include the name of the witness testifying prior to "Tr."

[3] From this point forward, when the Court cites to a docket number, the document can be found in miscellaneous case number 10-57.

**3.** As part of an examination, the IRS may issue summonses and information document requests ("IDRs") to obtain documents and written explanations from the taxpayer regarding its tax positions. (Timothy L. Erickson ("Erickson") Tr. 580:22-25, 583:2-8; Pagano Decl. ¶ 13.)

**4.** During an examination, the IRS compiles an examination file that can be used to substantiate the IRS's position if there is a dispute with the taxpayer. (*E.g.*, Erickson Tr. 571:4-16, 585:23-586:5, 588:12-22.)

**5.** An audit can conclude with the IRS issuing several notices of proposed adjustment, or "NOPAs," informing the taxpayer that it has rejected tax benefits claimed on the return. (Pagano Decl. ¶ 15.)

**6.** If a taxpayer disagrees with the IRS's position at the conclusion of an examination, it can file a refund claim and protest the adjustment. (Decl. of Mark A. Hager ¶ 28, Jan. 28, 2011, Docket No. 46.) It then has the option to pursue a case with the IRS Office of Appeals ("IRS Appeals"). (*Id.*; Pagano Tr. 439:17-440:10; Pagano Decl. ¶ 16.)[4]

**7.** A case at IRS Appeals begins with a protest by a taxpayer challenging the IRS on a position. (Pagano Tr. 440:11-20.) An IRS appeals officer gathers facts from both sides, reviews the facts and the law, and decides whether to offer the taxpayer a settlement on the issue. (*Id.* 441:18-442:10.) The appeals officer must be impartial and

---

[4] Wells Fargo's practice is to pay the income tax assessed by the IRS, and thereafter to file a claim for refund with the IRS with a protest challenging all of the disputed tax assessments for that year. (James A. Horton ("Horton") Tr. 176:25-177:8.)

is prohibited from communicating with revenue agents during this process. (*See* Erickson Tr. 630:1-5; Evan R. Biafore ("Biafore") Tr. 779:17-780:4; Pagano Decl. ¶ 17.) If an IRS appeals officer proposes a settlement for a given taxpayer, the IRS cannot reject it but the taxpayer can reject it. (Erickson Tr. 630:13-18.) Sometimes an appeals officer may receive direction from the IRS on the settlement that the officer may offer. (Pagano Tr. 442:14-23; *see also* Mark A. Hager ("Hager") Tr. 337:7-13.)

**8.**     If an issue is not resolved in IRS Appeals, a taxpayer may (1) petition the United States Tax Court or (2) after paying the additional tax resulting from the audit, file a civil action in the United States Court of Federal Claims or the United States District Court. (Pagano Decl. ¶ 18.)

## SUMMONSES AT ISSUE

**9.**     This case stems from the IRS's examination of Wells Fargo's federal income tax returns for the tax periods ending on December 31, 2007, and December 31, 2008.

**10.**     The IRS's audit of Wells Fargo's federal income tax returns for 2007 and 2008 commenced on October 19, 2009. (Hager Decl. ¶ 22.) The IRS completed its examination plan on January 10, 2010, and provided a copy of the plan to Wells Fargo. (*Id.* ¶ 43; Wells Fargo Trial Ex. 40.)

**11.**     On or about April 8, 2010, the IRS issued an IDR requesting certain information from Wells Fargo related to these tax years. (Hager Decl., Ex. D.)

12.     Wells Fargo did not turn disclose all of the information requested by this IDR, which led to the issuance of the three summonses on August 12, 2010.  (Hager Decl. ¶¶ 55-57.)   This case stems from those three summonses.   (First Decl. of Timothy L. Erickson ¶ 6, Nov. 1, 2010, Docket No. 9; Second Decl. of Timothy L. Erickson ¶ 4, Mar. 15, 2011, Docket No. 74[5].)

13.     The first summons requested production of Wells Fargo's tax accrual workpapers ("TAWs") for the 2007 and 2008 tax years, as well as documents pertaining to the preparation of those TAWs.  It directed Wells Fargo to appear at an IRS office in Minnesota in 2010 to produce these TAWs for examination.  (Second Erickson Decl. ¶ 5, Ex. 1.)

14.     The summons defined TAWs as:

> all accrual and other financial workpapers or documents created or assembled by the Taxpayer, an accountant for the Taxpayer, or the Taxpayer's independent auditor relating to any tax reserve for current, deferred, and potential or contingent tax liabilities, however classified or reported on audited financial statements, and to any footnotes disclosing reserves or contingent liabilities on audited financial statements.  They include, but are not limited to, any and all analyses, computations, opinions, notes, summaries, discussions, and other documents relating to such reserves and any footnotes.  Such documents may also be referred to as the "tax pool analysis," "tax liability contingency analysis," "tax contingency reserve analysis," "tax cushion analysis," or any other similar name.

(Second Erickson Decl. ¶ 6, Ex. 1.)[6]

---

[5] The exhibits from this declaration are located at Docket No. 54.

[6] The IRS provided this same definition in the other two summonses issued on August 12, 2010.  The Court will describe TAWs in more detail below.

**15.** The second summons directed Wells Fargo to produce a witness or witnesses to appear at an IRS office in Minnesota in 2010 to give testimony regarding the preparation and content of Wells Fargo's TAWs for the 2007 and 2008 tax years and the processes for identifying and measuring the amount of its "uncertain tax positions" ("UTPs") for those years in compliance with accounting regulations. (Second Erickson Decl. ¶ 7, Ex. 2.) The summons did not define the term UTPs.

**16.** At the evidentiary hearing, Wells Fargo's accounting expert defined a UTP as a tax position where "there exists the possibility that a taxing authority could have a different interpretation [than the taxpayer] of that particular tax position." (Edmund Outslay ("Outslay") Tr. 62:18-21; *see also* Decl. of James A. Horton ¶ 27, Jan. 28, 2011, Docket No. 47; Richard Stevens ("Stevens") Tr. 715:3-10; Horton Tr. 206:12-23; Hager Tr. 347:22-348:12, 349:5-13; United States Proposed Findings of Fact, Sept. 16, 2011, Docket No. 121.)

**17.** In response to the IDR and summonses, Wells Fargo produced approximately 750 pages of TAWs. (Second Erickson Decl. ¶ 9; Hager Decl. ¶¶ 59-60.) These TAWs included information about Wells Fargo's general policies for compliance with accounting regulations and aggregate information about Wells Fargo's UTPs, such as the aggregate amount of the reserve that Wells Fargo created due to its UTPs. (Hager Decl., Ex. G; Horton Tr. 202:11-203:1, 246:24-247:3; Horton Decl. ¶ 43; Hager Tr. 400:8-11.)

**18.** Wells Fargo withheld TAWs that pertained to the issue-by-issue identification and analysis of Wells Fargo's UTPs. (Horton Tr. 199:3-8; Horton Decl.

¶ 43.)  These TAWs and the subject matter contained within them are the subject of this litigation.

**19.** Wells Fargo provided the IRS with a log listing the TAWs it withheld. (Hager Decl., Ex. A.)

**20.** On its log, Wells Fargo claimed that it withheld certain TAWs requested because, among other reasons, they analyzed specific UTPs, identified UTPs, contained legal advice related to financial regulations, or involved allegedly irrelevant issues. (Hager Decl., Ex. A; *see also* Wells Fargo Trial Ex. 18; Second Erickson Decl. ¶ 9.)

**21.** On September 30, 2010, Wells Fargo produced James R. Horton, Wells Fargo's Senior Vice President and Corporate Tax Director, for an interview with the IRS. (First Erickson Decl. ¶ 13, Ex. 4.)  Horton answered questions regarding the manner in which Wells Fargo prepared its financial reporting disclosures.  (*Id*. ¶ 13.)  He declined to answer other questions on the grounds listed above.  (*Id*.; *see also* Horton Tr. 286:1-24 (describing Wells Fargo's motivations for challenging compelled testimony).)   Most notably, Horton would not identify Wells Fargo's UTPs.  (First Erickson Decl. ¶ 13.)

**22.** The third summons directed KPMG, Wells Fargo's auditor, to appear at an IRS office in Minnesota in 2010 to give testimony and to produce for examination Wells Fargo's TAWs related to Wells Fargo's financial statements for the 2007 and 2008 tax years.  (First Erickson Decl. ¶ 6, Ex. 1.)

**23.** The documents created by Wells Fargo and in KPMG's possession that Wells Fargo seeks to withhold include schedules listing UTPs and the amount reserved for each UTP, memoranda from Wells Fargo employees regarding each UTP, e-mail

correspondence with KPMG auditors regarding the UTPs, and information about allegedly irrelevant issues. (First Erickson Decl. ¶ 11; Decl. of Laura Newinski ¶¶ 40-41, Ex. 1, Jan. 28, 2011, Docket No. 50; Wells Fargo Trial Ex. 18; Hager Decl., Ex. B.)

**24.** KPMG has withheld numerous TAWs that are in the possession of both Wells Fargo and KPMG.

**25.** Wells Fargo also seeks to withhold documents created by KPMG. These include documents that directly or indirectly reflect KPMG's review and assessment of Wells Fargo's documentation regarding UTPs. (Newinski Decl. ¶ 43, Ex. 1.) These documents include information about Wells Fargo's settlement positions and state law issues. (*Id*.; Wells Fargo Trial Ex. 18; Hager Decl., Ex. B.)

**26.** The TAWs that the IRS has summoned are not available from any other source. (First Erickson Decl. ¶ 32.)

## GAAP AND "FIN 48"

**27.** Wells Fargo created its TAWs to assist with its financial statements. Wells Fargo is required to file quarterly and annual financial statements with the Securities and Exchange Commission ("SEC"). (Horton Decl. ¶ 6; Harvey Kelly ("Kelly") Tr. 114:15-24.)

**28.** Financial statements are documents that summarize the assets, liabilities, and equity of a company. (Kelly Tr. 113:10-15.)

**29.** Financial statements are prepared and released before the tax return for that same period is filed. (Stevens Tr. 686:22-687:2.)

**30.** A company's management is primarily responsible for preparing financial statements. (Kelly Tr. 114:10-12.)

**31.** Generally Accepted Accounting Principles ("GAAP") are "a series of general principles followed by accountants" in helping to prepare these financial statements.[7] *United States v. Basin Elec. Power Coop.*, 248 F.3d 781, 786 (8th Cir. 2001).

**32.** Corporations must obtain from an auditor an unqualified opinion that its financial statements conform with GAAP. *See* 15 U.S.C. § 78m(a)(2); (Laura Newinski ("Newinski") Tr. 645:3-7.)

**33.** The statutory authority to set accounting principles for financial statements has been delegated to the SEC. The SEC has, in turn, delegated the task of writing accounting standards to the private sector, principally the Financial Accounting Standards Board ("the FASB"). (Decl. of Edmund Outslay and Gary McGill ¶ 21, Jan. 28, 2011, Docket No. 48); *see In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 889-90 (8th Cir. 2002). GAAP thus includes financial accounting standards published by the FASB. *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d at 889-90.

**34.** The FASB published Financial Accounting Standards Board Interpretation Number 48 ("FIN 48") in June 2006. FIN 48 went into effect for the first financial reporting period beginning after December 15, 2006. (Ex. Re Counter Mot., Ex. A

---

[7] "Accountants long have recognized that 'generally accepted accounting principles' are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. 'Generally accepted accounting principles,' rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 544 (1979) (footnote omitted).

("FIN 48") ¶ 22, Nov. 1, 2010, Docket No. 12; Outslay Tr. 59:9-13; Outslay and McGill Decl. ¶ 30; Newinski Decl. ¶ 25.)

35.    Wells Fargo must follow the guidelines in FIN 48 because it is a publicly-traded company.  (Outslay Tr. 79:13-19, 102:6-10; Outslay and McGill Decl. ¶ 20; *see also* Horton Decl. ¶¶ 6-7.)[8]

36.    FIN 48 provides guidelines regarding how companies should compute their reserve for income taxes.  (Outslay Tr. 59:14-17; Outslay and McGill Decl. ¶ 30.)  The purpose of FIN 48 is to mandate that companies create a reserve, reflected in their financial statements, for benefits derived from tax positions that may ultimately be disallowed by the IRS.  (Outslay and McGill Decl. ¶ 19(a).)

## STEPS TAKEN PRIOR TO FIN 48's TWO-STEP PROCESS

37.    Wells Fargo's first step in computing its tax reserves for FIN 48 was differentiating between its "highly certain" tax positions and its UTPs.  (Horton Tr. 212:4-14; *see also* Newinski Decl. ¶¶ 27-28.)

38.    Wells Fargo's attorneys helped to create a list of UTPs for FIN 48 for the 2007 and 2008 tax years by looking to tax issues that Wells Fargo had previously

---

[8] *See also* 17 C.F.R § 210.4-01(a)(1) ("Financial statements filed with the [Securities and Exchange] Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.").

identified.  (Hager Tr. 349:5-18.)  This identification process will be described in more detail below.[9]

39.    Wells Fargo identified sixteen UTPs for federal tax years 2007 and 2008. (Hager Tr. 420:17-421:3, 496:18-22.)[10]

40.    Many UTPs are recurring issues that span multiple tax years.  (*See* Erickson Tr. 549:22-550:4.)

41.    Wells Fargo's approach of applying FIN 48's two-step process only to UTPs appears to be inconsistent with the plain language of FIN 48.

42.    FIN 48's plain language seems to require that its process applies to **all "tax positions,"** not just UTPs.  (FIN 48 ¶¶ A2, A19-20 ("Because of the difficulty of defining an uncertain tax position, the Board decided that all tax positions are subject to the provisions of this Interpretation.").)[11]    Indeed, Wells Fargo's auditor, KPMG,

---

[9] An example of a UTP that Wells Fargo has identified in the past is whether computer software constituted tangible property or intangible property and whether it was eligible for an investment tax credit.  (Hager Tr. 311:9-13.)  Other examples include disputes over the depreciation of furniture and fixtures (*id.* 311:20-25), whether online banking and ATMs qualified as research and experimentation expenditures (*id.* 312:1-7), and whether asbestos expenditures were deductible (*id.* 312:10-14).  UTPs have also included disputed transactions that are currently the subject of active litigation by Wells Fargo.  (*Id.* 314:18-316:25.)

[10] At trial, there was some confusion over the number of federal UTPs in 2007 and 2008. Wells Fargo's Tax Managing Counsel, Mark Hager, testified that there were eleven federal UTPs in 2007 and 2008 and that none "fell off" between 2007 and 2008.  (Hager Tr. 420:17-421:3.) Counsel for Wells Fargo later corrected Hager's testimony to state that there were sixteen federal UTPs in 2007 and 2008 and that one did "fall off" between 2007 and 2008, (Reid M. Figel Tr. 496:7-497:10), although it is unclear when or why this UTP was released from Wells Fargo's reserves.

[11] In fact, FIN 48 discusses a highly certain tax position being subjected to the recognition and measurement steps.  (FIN 48 ¶¶ A2, A19-20.)  (*See also* Outslay Tr. 56:9-24;

(Footnote continued on next page.)

acknowledged in its guide to the FIN 48 process that "FIN 48 applies to **all tax positions**, regardless of their level of uncertainty or the nature of the position." (United States Trial Ex. 11 at 8, Mar. 4, 2011, Docket No. 60 (emphasis added).)[12]

43.     As noted above, however, Wells Fargo did not apply the FIN 48 two-step analysis to all tax positions, but only to UTPs. (Horton Decl. ¶¶ 26, 28; *see also* Outslay Tr. 71:10-72:1.)[13]

44.     After identifying its tax positions, Wells Fargo was required to determine the appropriate "unit of account" for the UTPs it had identified. (*See* FIN 48 ¶ 5; Hager Tr. 351:11-19.) For example, if a taxpayer anticipates claiming a $1 million research and experimentation credit on its tax return for spending on four separate projects (that is, $250,000 of tax credit per project), the taxpayer must decide if the "unit of account" is one – for the overall credit – or four – for each separate project. (FIN 48 ¶ A5.) To make

_____

(Footnote continued.)

KPMG FIN 48 Implementation at 4, Mar. 4, 2011, Docket No. 60 (describing application of recognition step to highly certain tax positions).)

[12] FIN 48 defines a "tax position" as a "position in a previously filed tax return or a position expected to be taken in a future tax return that is reflected in measuring current or deferred income tax assets and liabilities for interim or annual periods." (FIN 48 ¶ 4; Outslay Tr. 55:14-17.)

[13] Wells Fargo enters into thousands, and perhaps millions, of transactions. (Hager Tr. 421:9-11.) Wells Fargo argues that, because virtually any transaction has tax implications, it had no choice but to apply a materiality threshold for positions it analyzes under FIN 48's two-step framework, applying the framework only to those positions that are of significant size, nature, and complexity to merit the IRS's attention. (*Id.* 421:12-21; *see also* Outslay and McGill Decl. ¶ 53.) Because a company can recognize the full amount of highly certain tax positions in its financial statements, Wells Fargo's accounting expert Edmund Outslay opined that best practices do not require FIN 48's two-step analysis to be applied to highly certain tax positions. (Outslay Tr. 56:7-57:5, 71:10-72:1.) It is unnecessary for the purposes of this order for the Court to decide if Wells Fargo complied with FIN 48, and the Court declines to do so.

this determination, the taxpayer must consider issues such as the magnitude of each project and overall spending, the level at which it accumulates information to support the tax return, and how the taxing authority would address the issue. (*Id.* ¶¶ A5, A8-A9.) The determination of the unit of account must presume that taxing authorities will evaluate the position and have full knowledge of all relevant information; in other words, this determination is not based on a taxpayer's actual expectations of what the IRS will discover and challenge. (*See id.* ¶ B14.)

**FIN 48's TWO-STEP PROCESS**

**45.** Once Wells Fargo identified its UTPs and determined the units of account, it applied FIN 48's two-step process to its UTPs.

**46.** The first step mandated under FIN 48 is called "recognition." (FIN 48 ¶ 6.) The taxpayer must conclude in this step whether it is "more likely than not, based on the technical merits, that the [tax benefit derived from the tax position] will be sustained upon examination." (*See id.*) "[T]he term **more likely than not** means a likelihood of more than 50 percent; the terms **examined** and **upon examination** also include resolution of the related appeals or litigation processes, if any." (*Id.*)

**47.** Specifically, in the case of a benefit claimed on federal taxes, the taxpayer must determine in the recognition step if it is more likely than not that the taxpayer will

be able to sustain the tax benefit[14] derived from the tax position if it litigated the case to the United States Supreme Court.  (*See* FIN 48 ¶ A2.)

**48.** The taxpayer must make the assumption that the tax position would be litigated, even if litigation has not been initiated and may never be initiated.  (Decl. of Richard G. Stevens at 4-5, Nov. 1, 2010, Docket No. 11; Outslay Tr. 89:8-11, 97:4-98:3; *see also* FIN 48 ¶ 7.)  As Wells Fargo's accounting expert acknowledged, even a company with a "zero percent expectation of litigation over [a] tax position" must recognize the position as part of its financial statements unless it is more likely than not that it will be able to sustain the tax benefit.  (Outslay Tr. 82:22-83:2; *see also* Stevens Tr. 682:4-14, 683:13-21, 684:20-24, 726:14-727:7, 761:1-762:5; Decl. of Evan R. Biafore ¶ 4, Nov. 1, 2010, Docket No. 10.)  The taxpayer must also not consider the likelihood that the IRS will discover a tax position, but instead must assume the IRS would have full access to all relevant information.  (Outslay Tr. 100:19-25; FIN 48 ¶¶ 7, B22; Outslay and McGill Decl. ¶ 77 ("[T]he entity must analyze each tax position and not just those that are probable of being audited and are material[.]").)  This assumption helps to avoid overly aggressive financial reporting.  (Stevens Decl. at 8.)

**49.** If a taxpayer determines that it is more likely than not that its tax position would not be sustained upon examination, the company must create a reserve (i.e. set aside funds) for 100 percent of the possible tax benefit.  (Outslay Tr. 97:4-7; Hager

---

[14] A "tax benefit" is the resulting economic benefit of a tax position, such as a reduction in tax liability that the taxpayer has or expects in the future.  (Outslay Tr. 56:2-6.)

Tr. 352:13-15.)  If the taxpayer determines that it is more likely than not that it would succeed upon examination, the company has met the first recognition step and moves on to the second step of FIN 48.  (Outslay Tr. 65:2-5; Hager Tr. 352:16-18.)

50.     The second step under FIN 48 is called "measurement."   (Outslay Tr. 61:25-62:1.)  This step involves quantifying the amount the company will set aside and record as a reserve because of its tax positions.  (*Id.* 67:6-13.)

51.     Under the measurement step, "[a] tax position that meets the more-likely-than-not recognition threshold shall . . . be measured as the largest amount of tax benefit that is greater than 50 percent likely of being realized upon ultimate settlement with a taxing authority that has full knowledge of all relevant information."  (FIN 48 ¶ 8.)

52.     The amount of the tax benefit that is more than fifty percent likely to be realized upon ultimate settlement with a taxing authority is called the "recognized tax benefit."  (Outslay Tr. 67:14-23.)  The difference between the filed tax benefit and the recognized benefit is called the "unrecognized tax benefit."   (FIN 48 ¶ 17; Outslay Tr. 67:22-68:1.)  The taxpayer must reserve its "unrecognized tax benefit."  (Outsley Tr. 67:9-13, 68:21-69:1; *see also* FIN 48 ¶¶ A21-22.)  If, however, a taxpayer determines that an entire tax benefit is more than fifty percent likely to be realized upon ultimate settlement with a taxing authority, the taxpayer need not reserve any of the tax benefit.  (*See* FIN 48 ¶¶ A21-22.)

53.     The measurement step, unlike the recognition step, requires the taxpayer to determine the probability of settlement outcomes with the IRS, if the IRS that had full knowledge of all relevant information, as opposed to requiring the taxpayer to envision

litigating the tax position to the United States Supreme Court. (Outslay and McGill Decl. ¶ 66.)

**54.** In assessing the probabilities of settlement outcomes for the measurement step, the taxpayer will consider factors such as the law supporting or placing into doubt the taxpayer's tax position and expectations regarding how aggressively the IRS and the taxpayer will pursue a particular position. (Outslay and McGill Decl. ¶¶ 69, 78.) In the measurement step, the taxpayer must also estimate its own and the IRS's settlement positions, again while assuming that the IRS has full knowledge of all relevant information. (*Id.* ¶ 70; Horton Decl. ¶ 38.)

## TAX ACCRUAL WORKPAPERS

**55.** Tax accrual workpapers is a term used for documents generated to assist in the FIN 48 analysis. (Horton Decl. ¶ 42.) TAWs are generally thought to include "workpapers prepared by the taxpayer, the taxpayer's accountant or the taxpayer's independent auditor that relate to the computation of [the] taxpayer's tax reserve for financial reporting purposes." (Outslay Tr. 51:14-21.)

**56.** The only specific documentation required by FIN 48 is a tabular reconciliation of the aggregate amount of a company's unrecognized tax benefits and an explanation of some timing issues related to those benefits. (FIN 48 ¶ 21; Outslay Tr. 72:12-14, 73:8-21.) FIN 48 does not mandate the generation of any other specific documentation or TAWs to accompany the FIN 48 analysis. (Outslay Tr. 72:2-7; Outslay and McGill Decl. ¶ 72.) Thus, all TAWs created beyond the tabular reconciliation are

produced for other reasons, such as a company's need to conduct its FIN 48 analysis or communicate with auditors.

57.    As a practical matter, it would be difficult, if not impossible, for a company to engage in a thorough FIN 48 analysis without generating some documentation of its specific calculations and analysis. (*See* Outslay Tr. 103:22-104:3; Stevens Tr. 698:7-700:8; Stevens Decl. at 6; United States Trial Ex. 11 at 27.) A company's auditor would most likely require documentation from the company regarding specific UTPs in order to certify that the company had accurately computed its tax reserve. (*See* Stevens Decl. at 9, Ex. 2 (Pub. Co. Accounting Oversight Bd. Auditing Standards AU §§ 9326.13); Outslay Tr. 78:19-79:7, 103:4-18; Decl. of Harvey Kelly ¶ 23, Jan. 28, 2011, Docket No. 49; Stevens Tr. 708:9-17, 709:21-713:25, 769:9-17.)

58.    Wells Fargo's auditor, KPMG, requested TAWs in accordance with its "unconditional responsibility to determine that audit documentation . . . contains sufficient information to enable an experienced auditor with no previous connection to the engagement to understand the nature, timing, extent and results of the procedures performed, the audit evidence obtained and the conclusions reached." (Newinski Decl. ¶ 39; *see also id.* ¶ 40.)

59.    There is no mandatory requirement, however, that an auditor gather **all** of the TAWs prepared by a taxpayer, and the precise content of the TAWs may vary from company to company. (Stevens Tr. 700:1-8, 701:14-702:24, 706:25-707:4, 749:15-25; Biafore Tr. 844:1-12.)

**60.**     Companies will sometimes already have documentation and analysis to help with the FIN 48 process before actively engaging in a FIN 48 analysis or taking a particular tax position on a return or financial statement.  (Outslay Tr. 66:3-67:5.)  These documents may also be understood to qualify as TAWs, depending on the specific documents.

## WELLS FARGO AND KPMG's TAX ACCRUAL WORKPAPERS

**61.**     Wells Fargo submitted the TAWs that it seeks to withhold from the IRS to the Court for in camera review.  Witnesses also provided general testimony about the content of these TAWs.

**62.**     The TAWs that include dates were created between 2006 and 2009.

**63.**     The TAWs include document "narratives" summarizing Wells Fargo's FIN 48 analysis.  (Wells Fargo Trial Ex. 36; Horton Tr. 220:20-221:10, 226:2-7, 267:18-268:4; *see also* Hager Tr. 354:14-24.)  Each narrative includes (1) a brief description of a UTP; (2) the relevant jurisdiction; (3) the relevant tax year(s); (4) the "unit of account" as defined by FIN 48; (5) the gross tax benefit associated with the UTP; (6) Wells Fargo's conclusion as to whether the UTP is more likely than not to be sustained in litigation under FIN 48's recognition step; and (7) assuming the position meets the recognition threshold, Wells Fargo's conclusion as to the amount of benefit that is more likely than not to be achieved in settlement or litigation.   (Wells Fargo Trial Ex. 36; Horton Tr. 220:20-225:18; *see also* Wells Fargo Trial Ex. 18 ¶ 1(a).)

64.     The Court determined in its review of Wells Fargo's TAWs that they sometimes include detailed assessments of Wells Fargo's opinions regarding potential litigation.  For example, they sometimes discuss whether Wells Fargo was likely to litigate an issue if a satisfactory resolution could not be reached and, if so, Wells Fargo's belief as to the likelihood that it would prevail in litigation.  The documents also sometimes include descriptions of what Wells Fargo believed the IRS planned to argue in challenging a tax position.

65.     Wells Fargo's accountants primarily created the document narratives, in consultation with Wells Fargo's attorneys.  (Horton Tr. 228:20-229:9.)

66.     Beginning in February 2008, in connection with preparing the December 31, 2007 FIN 48 workpapers, Wells Fargo attached to each "document narrative" a one-page attorney memorandum signed by a Wells Fargo attorney.  (Horton Tr. 219:24-220:2, 226:8-227:14; Hager Tr. 415:10-15; Horton Decl. ¶ 42.)  The purpose was to create "contemporary evidence" of the involvement of attorneys in the TAWs.  (Horton Tr. 219:24-220:2, 226:14-227:5; Hager Tr. 415:10-15.)   These memoranda identify the UTP at issue in the attached TAWs.  (Horton Tr. 228:13-19.)[15]

67.     Wells Fargo's TAWs also contain spreadsheets with various computations and information regarding Wells Fargo's identification of and/or reserves for individual

---

[15] Horton stated that, when Wells Fargo began preparing the memoranda, "[t]here was no actual change in the process.  This memorandum was actually just incremental to the process, again, to demonstrate [Wells Fargo's attorneys'] contemporaneous involvement.  We wanted to make sure that that evidence was included as part of our documentation."  (Horton Tr. 227:10-14; *see also* Wells Fargo Proposed Findings of Fact ¶ 117, Sept. 16, 2011, Docket No. 125.)

UTPs. (Horton Tr. 220:3-5.) For example, the TAWs include spreadsheets that use the amount of the tax position and the reserve percentage to compute the amount of the tax reserve to be recorded for that position. (*Id.* 229:13-230:7.) Each spreadsheet identifies a particular UTP, reveals the reserve percentage for that UTP, and/or reveals the reserve amount for the UTP. (*Id.*; *see also* Wells Fargo Trial Ex. 18 ¶ 2(a).)

68.    In addition, the TAWs contain reports and data files related to DMI48, a third-party software application that Wells Fargo licenses to report and compute the interest that would be due to the IRS if the tax benefit reported on the return were disallowed, an amount which must be included in the tax reserve. (Horton Tr. 220:6-13, 230:24-231:23; Horton Decl. ¶¶ 39, 44.) Some of these reports compute interest on Wells Fargo's tax reserves in the aggregate; others compute interest on tax reserves for individual UTPs. (Horton Tr. 233:22-235:21; *see also* Wells Fargo Trial Ex. 18 ¶ 2(b).)

69.    Wells Fargo's TAWs also include other documents, including communications incorporating the identification and analysis of individual UTPs. (Wells Fargo Trial Ex. 18 ¶¶ 1(c), 3(a)-(c); *see also* Horton Tr. 261:20-269:2.)

70.    As noted above, as part of its audit of Wells Fargo's 2007 and 2008 financial statements, KPMG obtained certain of Wells Fargo's TAWs. (Horton Tr. 244:14-245:2; Horton Decl. ¶¶ 54, 57-59, 61.) Among the TAWs provided to KPMG were certain of Wells Fargo's document narratives (some of which also contained the attorney cover memorandum), FIN 48 spreadsheets, and DMI48 reports. (*See* Wells Fargo Trial Ex. 18 ¶¶ 5(1a)-5(4).) In some cases, KPMG employees made handwritten notations on those documents, some of which describe UTPs. (*See* Horton Tr. 282:3-10.)

Wells Fargo also provided KPMG with certain additional documents further discussing particular UTPs. (*Id.* 283:2-13; *see* Wells Fargo Trial Ex. 18 ¶ 5(5).)

71. To determine if it agreed with Wells Fargo's FIN 48 analysis, KPMG looked at source data and calculations, reviewed Wells Fargo's TAWs, and had discussions with Wells Fargo employees. (Horton Tr. 242:11-243:10, 284:14-285:7; Horton Decl. ¶¶ 48-49, 52; Newinski Tr. 647:13-648:2, 657:14-23.) KPMG used this information to create its own TAWs concerning Wells Fargo's UTPs and FIN 48 analysis. (*See* Wells Fargo Trial Ex. 18 ¶ 6(a); Newinski Tr. 658:2-25.)

72. The TAWs drafted by KPMG test Wells Fargo's FIN 48 analysis and reflect KPMG's conclusions regarding the reasonableness of that analysis. (Newinski Tr. 657:12-658:25; Newinski Decl. ¶¶ 34-38.) The documents identify and describe particular UTPs as well as Wells Fargo's FIN 48 analysis. (Newinski Decl. ¶ 34.)

73. Wells Fargo's Tax Managing Counsel, Mark Hager, testified that it would be possible to produce the withheld TAWs in a redacted form that would identify each individual UTP along with any factual description of the transactions underlying the UTPs without disclosing other information in the documents. (Hager Tr. 411:4-23.)

## INVOLVEMENT OF ATTORNEYS IN FIN 48

74. FIN 48 does not mandate who must conduct the FIN 48 analysis. (Outslay Tr. 84:19-22.)

**75.** It is "not uncommon" for tax counsel to be involved in a company's analysis under FIN 48's recognition step. (Outslay and McGill Decl. ¶ 62; Stevens Tr. 723:12-14, 738:4-7.)

**76.** Attorneys are also sometimes used to conduct FIN 48's measurement step. For the measurement step, attorneys' knowledge is sometimes accessed "with respect to negotiation strategies [due to the attorneys'] experience." (*See* Outslay Tr. 70:16-71:1.) As described above, the measurement analysis may involve a company's "thoughts and opinions of likely outcomes, the settlement options that the company was willing to consider [and a company's] intent to litigate." (*See id.* 71:2-9.)

**77.** The use of an attorney is not necessary to prepare TAWs or conduct a FIN 48 analysis, however. (Outslay and McGill Decl. ¶ 75 ("Companies are not required to obtain formal legal opinions to support their FIN 48 decisions . . . .") (internal quotation marks omitted); Stevens Tr. 679:11-23, 680:19-21, 687:15-20, 731:18-22; Biafore Tr. 774:21-776:23.) Accountants sometimes perform the FIN 48 analysis for companies. (Outslay and McGill Decl. ¶¶ 62, 75; *see also* Stevens Tr. 725:17-726:1.) In fact, trainings are provided by groups such as the American Institute of Certified Public Accountants to educate in-house accountants on how to analyze applicable tax laws and authorities and apply them to the relevant facts under FIN 48. (Outslay and McGill Decl. ¶ 62; *see also* Stevens Tr. 687:12-20; Biafore Tr. 775:24-776:1[16].)

---

[16] Although Evan Biafore, a senior team coordinator for the IRS who is part of the cadre of IRS experts on TAWs, is not an expert in FIN 48 and has not reviewed TAWs completed under FIN 48, his experience with TAWs prior to the implementation of FIN 48 gives him some

(Footnote continued on next page.)

## INVOLVEMENT OF WELLS FARGO'S TAX ATTORNEYS IN STRUCTURING BUSINESS TRANSACTIONS

78. The involvement of Wells Fargo's attorneys with Wells Fargo's tax positions often begins well before the FIN 48 analysis takes place.

79. The Tax Department at Wells Fargo contains a Tax Controversy Group ("TCG"). (Horton Decl. ¶ 13.) In 2007 and 2008, the TCG consisted of five individuals, four of whom were attorneys. (*Id.* ¶ 16; Horton Tr. 145:14, 157:9-10; Hager Tr. 318:9-14.) The TCG's primary goal is to handle tax controversies between Wells Fargo and the IRS at the examination level, during IRS Appeals, and in court litigation. (Horton Tr. 147:9-16.)

80. Mark Hager, Tax Managing Counsel, has served as head of the TCG since the late 1990s. (Horton Decl. ¶ 16.) Hager reports to James R. Horton, Wells Fargo's Senior Vice President and Corporate Tax Director, who is not an attorney. (*Id.* ¶ 13.)

81. The TCG becomes involved in Wells Fargo's business transactions that have tax significance before these transactions occur. (*See* Horton Decl. ¶ 17; Horton Tr. 157:2-8, 295:5-13; Hager Tr. 319:12-324:5, 325:1-326:14.) "The tax consequences of a transaction may be significant, and therefore brought to the Tax Controversy Group for review, [if the transaction is] (1) 'significant in the dollars involved'; (2) 'a very complex

---

(Footnote continued.)

familiarity with the ability of accountants to identify UTPs and complete at least some aspects of TAWs. (*See* Biafore Tr. 814:8-19, 817:17-818:24, 853:11-18.)

transaction'; and/or (3) a 'structured transaction,' to which the IRS gives heightened scrutiny." (Wells Fargo Proposed Findings of Fact ¶¶ 51, 54.)

**82.** The TCG focuses on structuring these transactions to achieve the optimal tax result for Wells Fargo and its shareholders. (Horton Tr. 148:1-19.)

**83.** When helping to structure business transactions, the TCG creates memoranda regarding the various tax issues involved in the transactions. (Hager Tr. 326:19-22.) The attorneys look to statutes, regulations, and case law that could affect Wells Fargo's transactions. (*Id.* 157:2-8.) Wells Fargo attorneys may consider potential challenges from the IRS and try to help structure Wells Fargo's transactions to avoid or best deal with these challenges. (*See id.* 157:20-159:3.)

**84.** The TCG may also be involved in reviewing "due diligence and business purpose memos provided by the business line." (Hager Tr. 326:22-23.) These documents are created by divisions other than the Tax Department, and the TCG "guide[s] and shepard[s]" those business purpose memoranda. (*Id.* 327:3-4.)

**85.** When reviewing business transactions, Wells Fargo builds an "audit file" of records relevant to these transactions to use if an IRS investigation occurs. (Hager Tr. 326:15-329:22, 412:25-413:10.) Documents in these audit files have not been submitted to the Court and are not the subject of this litigation. (*Id.* 412:24-413:18, 414:24-415:4.)

**86.** Non-lawyer employees outside the TCG also engage in structuring business transactions that involve questionable tax positions. *See WFC Holdings Corp. v. United States*, Civ. No. 07-3320, 2011 WL 4583817, at *3, *6 (D. Minn. Sept. 30, 2011)

(describing how Don Dana, Wells Fargo's top real estate executive, was tasked with identifying a non-tax business purpose for a lease restructuring transaction later challenged by the IRS).

87.     Accountants in other divisions of the Tax Department are involved in analyzing business transactions that would accrue a tax benefit for Wells Fargo. These accountants may, for example, calculate accounting consequences that arise from Wells Fargo's acquisitions. (Horton Tr. 157:9-15.)

88.     Wells Fargo would not engage in transactions aimed at a tax benefit unless there was a seventy to eighty percent chance that the tax opinion would be upheld (Horton Tr. 150:4-17; *see also* Hager Tr. 312:23-313:24, 328:16-19), because Wells Fargo believes that it would not be worth its time and money to enter into a transaction "that's just not going to go anywhere . . . ." (Hager Tr. 324:14-22.)

89.     Courts have not always agreed with Wells Fargo's assessments, however, and have refused to recognize some tax benefits claimed by Wells Fargo. (*See, e.g.*, Horton Tr. 296:2-23; Ex. A to United States Post-Trial Brief, Sept. 19, 2011, Docket No. 127.)

**RELATIONSHIP OF STRUCTURING BUSINESS TRANSACTIONS TO IDENTIFYING FIN 48 UTPs**

90.     The Court finds that Wells Fargo identified its UTPs around the time that it entered into the business transactions related to those UTPs.

91.     Hager stated that UTPs analyzed under FIN 48 were identified by looking to "the issues that [Wells Fargo's attorneys] had identified pre-examination, issues that

[were] identified pursuant to IRS audits, and issues that were at IRS appeals and that were in litigation." (Hager Tr. 348:19-24.) Wells Fargo never established that the IRS had challenged UTPs that Wells Fargo had not already identified when formulating the underlying transactions related to UTPs. (*See id.* 317:15-18 ("[W]e think we have a very good understanding of what the IRS will be challenging when it comes to Wells Fargo issues, and that has proved to be accurate over the years."), 342:25-343:22 (describing identification of UTP prior to filing of tax return or IRS challenge), 355:5-15 (stating that issues identified by Wells Fargo were later challenged by the IRS); Horton Tr. 295:5-13 (stating that Wells Fargo's tax attorneys review all transactions with tax significance).) Accordingly, the Court finds that Wells Fargo identified each of the UTPs prior to conducting its financial reporting or facing a challenge by the IRS.

92. Indeed, Wells Fargo would structure transactions and analyze Wells Fargo's tax risks, including identifying potentially controversial tax positions, even if Wells Fargo was not subject to FIN 48 or other financial reporting requirements. (*See, e.g.*, Horton Tr. 169:9-25, 183:25-184:11, 203:14-205:15, 239:18-240:15; Hager Tr. 341:21-342:16, 344:22-346:8, 350:10-21.) Before and after the implementation of FIN 48, Wells Fargo's lawyers were involved with assessing potential tax liabilities and helping the tax director determine the consequences of such positions. (Horton Tr. 184:3-11, 204:1-23; Horton Decl. ¶ 33; Hager Tr. 330:18-331:3, 345:7-19.) And the TCG still does so, in at least some cases, well before any FIN 48 analysis is conducted. (*See, e.g.*, Hager Tr. 342:25-343:22 (describing identification of UTPs prior to filing of tax return or IRS challenge), 352:23-353:3; Horton Decl. ¶ 27; Horton Tr. 183:25-184:11

(stating that, before the adoption of FIN 48, Wells Fargo identified "uncertain tax position transactions"), 203:14-205:15, 239:18-240:15.)

93.     In an attempt to comply with FIN 48, Wells Fargo's tax accountants have "tap[ped] into" the pre-existing opinions of Wells Fargo's attorneys about UTPs when determining the tax positions it would subject to a FIN 48 analysis.  (*See* Hager Tr. 341:21-342:16, 346:19-347:12.)[17]   The TCG thus largely determined which tax positions to subject to FIN 48.  (*Id.* 348:13-349:18.)


**INVOLVEMENT OF WELLS FARGO'S ATTORNEYS IN TWO-STEP FIN 48 PROCESS**

94.     The recognition step under FIN 48 was "largely" performed for Wells Fargo by tax attorneys.  (Horton Tr. 168:13-18; *see also id.* 214:20-24, 239:12-17; Hager Tr. 342:17-343:22, 357:13-23.)

95.     It was not necessary for Wells Fargo's attorneys to engage in additional legal research or evaluation of UTPs in order to perform the recognition step.  (Hager Tr. 353:5-13.)  The work needed for the recognition step "had been ongoing for the past 25 years within [the TCG].  And basically [the recognition step] was just a matter of the tax accountants stepping in asking us where we were at that particular point in time in our litigation efforts."  (*Id.* 353:9-13, 401:18-24; *see also* Horton Tr. 211:18-24.)

---

[17] *See also* Hager Tr. 344:22-346:8, 350:10-21 (stating that the core responsibilities of Wells Fargo's attorneys did not change with the adoption of FIN 48); Horton Tr. 169:9-25 ("Just because FIN 48 came along didn't change our assessment of what the tax risks were that the company faced.  The tax law didn't change.  Just how you accounted for it changed.").

96.     Wells Fargo also "look[ed] to" the attorneys in the TCG to perform the measurement step of FIN 48.     (Horton Tr. 216:12-17.)     The TCG determined the strengths and weaknesses of Wells Fargo's arguments in favor of its tax position and anticipated acceptable settlement figures to determine the appropriate numbers to use for the measurement step.  (Hager Tr. 353:14-354:13.)

97.     Horton, who is not an attorney, ultimately made the decisions about the content of Wells Fargo's FIN 48 analysis, but, in doing so, he "relied very heavily" on the advice of the TCG.  (Horton Tr. 217:5-14; Horton Decl. ¶ 25.)

98.     Although attorneys were involved with the FIN 48 analysis, the TAWs that Wells Fargo is withholding were primarily "physically created and assembled by the tax accountants" in the Tax Accounting Group ("TAG"), who consulted with the TCG. (Hager Tr. 358:6-359:14, 361:5-362:21.)

99.     The TAG primarily created the TAWs for 2007 and 2008.  (Horton Decl. ¶ 42.)  The TCG was more involved with creating this documentation in 2008 than in 2007.  (*Id.*)

100.     The TAG also maintained physical control of the FIN 48 documentation. (Horton Tr. 291:25-292:11.)

101.     The TCG was not granted access to the FIN 48 files on Wells Fargo's computers.  (Horton Tr. 293:1-4.)

## INVOLVEMENT OF WELLS FARGO'S ATTORNEYS IN IRS EXAMINATIONS

**102.** The TCG's attorneys are the contacts for the IRS during its examinations, along with Horton and one other employee. (Hager Tr. 331:10-23, 333:2-17.) Hager testified that Wells Fargo uses its attorneys as contacts with the IRS because they are sensitive to the issues that could arise in litigation. (*Id.* 335:1-16.)

**103.** The TCG's attorneys and outside counsel represent Wells Fargo at IRS Appeal hearings. (Hager Tr. 337:14-338:17.)

**104.** The TCG's attorneys also partner with outside counsel if a UTP proceeds to court litigation. (Hager Tr. 339:20-340:8.)

**105.** The TAG has little interaction with the IRS in examinations or on IRS Appeals, but it may become involved in supplying information or documents to Wells Fargo's attorneys. (Horton Tr. 184:22-185:3.)[18]

## THE IRS's PURPOSE IN ISSUING THE SUMMONSES

**106.** Wells Fargo's tax returns are complex. (First Erickson Decl. ¶ 5.) Wells Fargo's 2007 and 2008 tax returns each number over 8,000 pages. (*Id.*)

**107.** The UTPs identified in the TAWs are largely based on complex transactions, sometimes involving multiple foreign entities and multi-step transactions.

**108.** Timothy Erickson is the senior team coordinator for the IRS in connection with Wells Fargo's 2007 and 2008 federal income tax returns. Erickson testified that his

---

[18] Accountants, not attorneys, are responsible for preparing and filing Wells Fargo's federal corporate income tax returns, with rare exceptions. (Horton Tr. 187:8-188:1.)

primary goal in reviewing Wells Fargo's TAWs, if the IRS received them, would be to verify the accuracy of Wells Fargo's tax returns and to ensure that the IRS had identified all of Wells Fargo's tax positions that might be subject to IRS challenge. (Erickson Tr. 518:9-522:21, 637:3-6; *see also* First Erickson Decl. ¶ 25.)[19]

109. Erickson is not interested in what Wells Fargo's lawyers think about a tax issue or position; rather, he wants to ensure that he knows about the existence of tax positions that may not be apparent from Wells Fargo's tax returns so that the IRS can examine the positions and make their own assessments of them. (Erickson Tr. 519:6-10, 547:7-548:22.)

110. In Erickson's view, some information from the TAWs beyond the identification of tax positions, such as the size of reserves, would also be relevant and helpful to the IRS in its investigation – although his primary motivation in reviewing the TAWs would be the identification of Wells Fargo's tax positions.[20] (Erickson Tr. 518:2-5, 519:6-521:20.)

---

[19] Because Erickson did not issue the summonses, nor did he purport to fully understand the IRS's policy of restraint, the Court agrees with Erickson's testimony that he could not offer a fully informed opinion on whether the IRS complied with its policy of restraint – a policy discussed further below – in issuing the summonses. (*See* Erickson Tr. 536:18-537:23, 609:4-12.) The Court further finds Erickson's speculation about the possible motivations of IRS officials in creating the policy of restraint to be of minimal relevance, because it was not established that Erickson had any personal knowledge of those individuals' motivations. (*See id.* 611:17-612:3; *see also* Wells Fargo Trial Ex. 58 at 2.)

[20] Erickson testified in his deposition that TAWs were irrelevant to the IRS beyond the identification of UTPs. (Erickson Tr. 523:12-15.) The Court finds reliable Erickson's testimony at trial that, upon further reflection, he determined that TAWs would be relevant for other purposes. Erickson appeared forthright on the stand and gave specific reasons why TAWs could

(Footnote continued on next page.)

**111.** Erickson did not find the select TAWs from 2007 and 2008 that Wells Fargo disclosed to the IRS to be helpful in his investigation. (Erickson Tr. 535:10-12.)

**112.** Erickson's superiors at the IRS made the final decision to issue the summonses to Wells Fargo and KPMG. (Erickson Tr. 536:21-537:23.) These individuals did not testify at the evidentiary hearing.

**113.** Erickson did not recall any IRS employees telling him they thought it was inappropriate or that they were offended by Wells Fargo pressing certain tax positions in federal court. (*See* Erickson Tr. 592:13-593:9.) Erickson does not believe there is "anything wrong" with Wells Fargo pursuing a refund for its tax positions, and, in his opinion, the IRS "agrees that [Wells Fargo is] entitled to litigate the issue and to file a refund claim." (*Id.* 592:10-16.)

**114.** Biafore, a senior team coordinator for the IRS who is part of the cadre of experts on TAWs, also testified regarding why the identification of UTPs would be useful to the IRS. Although Biafore was not involved in the examination team for Wells Fargo's 2007 and 2008 tax returns, the Court found his general testimony about TAWs relevant because of his experience working for the IRS and preparing and reviewing TAWs. (*See* Biafore Tr. 794:9-21, 800:16-801:10, 808:19-25, 810:11-15; Erickson Tr. 536:5-11.)

———————————————

(Footnote continued.)

be useful to the IRS for purposes other than the mere identification of UTPs, such as identifying the size and importance of a UTP.

**115.** Biafore testified that it is very possible – and in fact probable – that a revenue agent could miss issues on a tax return. (Biafore Tr. 833:1-9, 833:17-834:7.) This is so because many so-called abusive tax avoidance transactions "are designed to appear on the surface like legitimate business transactions in order to avoid detection by the IRS [and] may consist of several complex financial instruments or agreements involving several counterparties, frequently including international entities." (Biafore Decl. ¶ 7.) Agents who discover one part of the transaction may have difficulty connecting it with other parts of the transaction to fully understand the overall transaction. (*Id.*)

**116.** Biafore has previously discovered abusive tax avoidance transactions through his review of TAWs. (Biafore Decl. ¶ 8.)

**117.** In Biafore's view, the IRS reviews TAWs to help identify issues that have not been discovered in an examination. (Biafore Decl. ¶ 6.)

**118.** Wells Fargo disagrees, stating that "[a]ll of the uncertain tax positions that could impact [Wells Fargo's] 2007 and 2008 tax returns are identified in the [IRS's Examination] Plan, are the subject of an IDR issued during the current examination, or both." (Hager Decl. ¶ 44.) Thus, Wells Fargo argues that the IRS does not need to review Wells Fargo's documents concerning UTPs to "'fully examine[]' uncertain tax positions it already knows about." (*Id.*; *see also id.* ¶ 87.) Wells Fargo also asserts that requesting its TAWs is unnecessary to the IRS's investigation because there are

alternative examination techniques available to the IRS to obtain information about a tax return.  (Pagano Decl. ¶¶ 20-37; Pagano Tr. 482:4-6.)[21]

**119.**    Having observed Erickson's demeanor and carefully assessed his testimony and the testimony of each witness, the Court finds that Erickson's testimony reliable and, accordingly, finds that his primary motivation in reviewing Wells Fargo's TAWs would be verifying the accuracy of Wells Fargo's tax return.

**120.**    The Court further finds, based on the evidence presented, that the IRS's motivation in issuing the summonses at issue was to verify the accuracy of Wells Fargo's tax returns.

## WELLS FARGO's MOTIVATION IN WITHHOLDING TAWs

**121.**    The Court finds that Wells Fargo has two primary motivations for withholding its TAWs from the IRS.

**122.**    First, because the dollar amounts for each UTP are "significant,"[22] Wells Fargo is concerned that disclosing information about its UTPs to the IRS would "compromise" Wells Fargo's ability to achieve tax benefits.  (Horton Tr. 286:6-12; *see also* Hager Tr. 420:4-9, 422:8-12, 423:3-9; Stevens Tr. 754:25-758:17.)  Horton pointed to, for example, the IRS's recent discovery of an allegedly "abusive tax transaction"

---

[21] The Court will further address these issues in its Conclusions of Law.

[22] The aggregate amount of Wells Fargo's reserve for unrecognized tax benefits was approximately $2.7 billion in 2007 and $3.2 billion in 2008.  (Horton Decl. ¶ 41.)

undertaken by Wells Fargo in 2008 as a reason why Wells Fargo seeks to "carefully manage" its tax issues. (Horton Decl. ¶ 47.)

123. Second, Wells Fargo believes it is not legally required to disclose its TAWs and does not wish to do so due to privilege and other issues. Wells Fargo has categorized by color the TAWs that it submitted to the Court for review, according to the reasons that it seeks to withhold information. Specifically, it categorized material by: (1) information revealing the identity of UTPs, (2) information revealing recognition analysis under FIN 48, (3) information revealing measurement analysis under FIN 48, (4) information related to state and local tax liability, which Wells Fargo claims is irrelevant, (5) information related to Wachovia tax liability, which Wells Fargo claims is irrelevant, and (6) information revealing privileged attorney-client communications. It also seeks generally to withhold the TAWs because, it contends, the IRS has an improper purpose in requesting them.[23]

## WELLS FARGO's EXPRESSED VIEWS ON LIKELIHOOD OF LITIGATION

124. Horton and Hager testified that Wells Fargo has experienced a high degree of controversy with the IRS over the years and expects to be challenged on all of its UTPs. (Horton Tr. 155:11-15, 172:16, 20, 175:7-9; *see also* Hager Tr. 309:11-310:1,

---

[23] The Court notes that some items categorized as "revealing the identity of UTPs" in fact have information that fall into other categories. For example, one item in this category discusses the anticipated potential settlement of certain tax positions, which relates to Wells Fargo's measurement analysis. (KPMG Sealed Document 78 at 8.) Another item discusses the likelihood that Wells Fargo would intend to litigate an uncertain tax position, which is again related to Wells Fargo's measurement analysis. (KPMG Sealed Document 82 at 2.)

355:5-15; Pagano Decl. ¶ 12.)  They believe that litigation starts at the time of the IRS examination because the IRS begins building its evidentiary record at that time.  (Hager Tr. 318:15-319:8, 334:19-25, 338:18-339:6; Horton Tr. 172:16-173:4, 175:15-21, 176:3-4; *see also* Pagano Decl. ¶¶ 15, 19.)

125.  Wells Fargo "routinely" takes issues to IRS Appeals, but, according to Wells Fargo, has "difficulty getting satisfactory settlements" there, and consequently often litigates issues in federal court.  (Horton Tr. 173:5-11, 174:18-175:4; *see also id.* 207:8-19; Hager Tr. 313:11-24.)

126.  Horton is responsible for deciding whether Wells Fargo will litigate an issue.  The only group in the tax department that participates in this decision-making process is the TCG.  (Horton Tr. 160:1-12.)

127.  In July 2011, Wells Fargo was in litigation with the IRS over three tax transactions.  (Horton Tr. 179:2-21.)  At least two of these transactions involved a potential tax liability of hundreds of millions of dollars.  (*Id.* 179:22-180:9.)

128.  At any given time, Wells Fargo is usually involved in one or two cases in litigation and has several cases before IRS Appeals.  (Horton Decl. ¶ 20.)

129.  Wells Fargo resolves some issues with the IRS prior to IRS Appeals or federal court litigation.  (*See* Hager Tr. 340:10-14, 389:24-390:3; Horton Tr. 176:18-24.)

**IRS's EXPRESSED VIEWS ON LIKELIHOOD OF LITIGATION**

130.  Erickson testified that the IRS examination process is "inherently adversarial" because the taxpayer takes positions to try to minimize its tax expense.

(Erickson Tr. 572:22-573:12.)  United States witness Richard Stevens, an expert in accounting and auditing, testified that a better description is that the IRS and the taxpayer have "different interests."  (Stevens Tr. 716:22-717:3.)  Biafore testified that his audits were not contentious, even if a case was going to IRS Appeals.  (Biafore Tr. 780:17-24.)

**131.**    Although Erickson characterized the examination process as "inherently adversarial," he recognizes that his job is not to maximize treasury revenue but rather to ensure that correct positions are taken by the taxpayer.[24]    (Erickson Tr. 570:12-19. 573:13-16, 573:25-574:4.)

**132.**    Erickson did not actively consider litigation in his examination process of Wells Fargo because his goal was to resolve issues at the lowest possible level.  (Erickson Tr. 590:13-21.)

**133.**    Although Erickson was aware that litigation over various tax issues was a possibility, he did not consider how the documentation he compiled might be used in litigation.  (Erickson Tr. 590:4-10.)  He was aware, however, that the record created may need to substantiate the position the IRS took in any disputes with Wells Fargo.  (*Id.* 590:22-591:16; *see also* Stevens Tr. 730:7-24[25].)

---

[24] Stevens testified that the IRS tries to take an impartial view of tax ambiguities, but that it tends to resolve ambiguities in its own favor.  (Stevens Tr. 715:11-716:2.)

[25] Stevens admitted that TAWs may have some information in them that would be useful to the IRS if it enters into litigation with a taxpayer over a particular issue.  (Stevens Tr. 730:7-24.)  When Stevens testified that TAWs can have "dual purposes," his meaning was that TAWs could potentially be useful in litigation and not that they were **created** for the purpose of litigation.  (*See id.* 730:1-20, 733:23-737:24, 739:19-740:19, 763:9-766:21.)  When faced with

(Footnote continued on next page.)

**134.** Erickson noted that Wells Fargo is willing to litigate its positions with the IRS and is somewhat unique in its propensity to litigate. (Erickson Tr. 567:25-568:12.) However, Erickson also noted that Wells Fargo and the IRS have resolved many issues without litigation, either at the examination stage or before IRS Appeals. (First Erickson Decl. ¶ 3; *see* Horton Decl. ¶ 18; Erickson Tr. 559:9-11, 569:20-570:8.)

**135.** Biafore – who has not audited Wells Fargo – testified that of the twenty audits he had completed as an IRS employee, approximately eighteen were resolved at the examination level and did not move on to IRS Appeals. (Biafore Tr. 778:1-5.) Biafore also testified that he did not create a different kind of file during an examination if he knew it was going to IRS Appeals. (*Id.* 780:25-781:10.) According to Biafore, the IRS emphasizes to agents that they are to attempt to resolve cases at the lowest level. (*Id.* 783:23-784:6.)

**136.** The Court finds Erickson's statement that he did not seek to maximize taxpayer revenue in his examinations of Wells Fargo, but rather that he sought to arrive at a correct determination of the legality of Wells Fargo's tax positions, to be believable. His statement that he did not seek to litigate issues with Wells Fargo but rather sought to resolve them at the lowest possible level was also credible.[26]

--------------------------------

(Footnote continued.)

persistent questioning during cross examination, Stevens continually returned to this basic premise, and the Court finds his testimony as to this opinion credible. (*See id.*)

[26] As noted above, Erickson took an evenhanded approach to discussing Wells Fargo and its tax positions. Erickson testified, for example, that Wells Fargo was entitled to litigate issues and to file refund claims if it believed that the IRS was wrong in challenging a tax position.

(Footnote continued on next page.)

## LITIGATION OF UTPs

**137.** In July 2011, of Wells Fargo's UTPs for 2007 and 2008, "basically one-third . . . [we]re currently in litigation, about another third [we]re at IRS appeals, and . . . the remainder had been the subject of prior [IRS] examinations or the current examination." (Hager Tr. 349:19-350:5, 351:3-6, 355:5-15, 409:12-410:11.)

**138.** Hager explained that "subject to IRS examination" meant that the IRS had expressed concern about Wells Fargo's tax position on a particular UTP. (Hager Tr. 355:18-356:14; *see also id.* 367:15-368:4, 371:13-17, 372:22-373:18.) Although it was unclear, it appeared that neither party had pursued litigation or IRS Appeals on at least some of the UTPs "subject to prior IRS examination."[27]

**139.** There are numerous recurring issues between the IRS and Wells Fargo that are disputed in subsequent tax cycles. (Erickson Tr. 558:4-16.)

_____

(Footnote continued.)

(Erickson Tr. 592:4-593:9.) Biafore similarly testified that he had told a taxpayer that it overreported its tax, showing that his primary goal was also not always to increase the IRS's revenue. (*See* Biafore Tr. 784:7-10.)

[27] Horton stated that the majority of the 2007 and 2008 UTPs were, in January 2011, in active litigation or at IRS Appeals. (Horton Decl. ¶ 46; *see also* Horton Tr. 238:3-10.) All but two of those same UTPs were in active litigation or at IRS Appeals when the TAWs were created. (Horton Decl. ¶ 46.) Regarding the one-third of UTPs "subject to prior examination," Hager stated that "these issues were raised as issues in the examinations of prior [cycle years]. Some of those may have gone on to appeals. Some of those may have gone on to litigation. But we know that the IRS was concerned about [those] issues and had raised those in examinations." (Hager Tr. 356:3-12.) Horton also stated that most of the UTPs at issue in this case had been the subject of some sort of formal challenge by the IRS at the time the TAWs were created, such as: public pronouncements of the IRS's intent to challenge the position; the issuance of a notice of proposed adjustment in a previous examination; escalation of a dispute to IRS Appeals; or existing litigation. (Horton Decl. ¶ 34.) No witness stated that all of the UTPs had at some point gone to litigation or IRS Appeals.

## POLICY OF RESTRAINT

**140.** In 1982, the IRS included certain procedures regarding requests for TAWs in the Internal Revenue Manual. (Pagano Decl. ¶¶ 39-40.) The procedures regarding TAW requests became known as a "policy of restraint." (*Id.* ¶ 40.) The policy stated that TAWs should not be sought "as a matter of standard examining procedure" and "should normally be sought only when such factual data cannot be obtained from the taxpayer's records or from available third parties, and then only as a collateral source for factual data." (*Id.*)

**141.** In 2002, the IRS issued a revised "policy of restraint," which indicated when it intended to request TAWs. (First Erickson Decl., Ex. 5); *see also* IRS News Release, IRS Changes Policy on Workpaper Requests to Fight Abusive Tax Avoidance Transactions, IR-2002-78 (June 17, 2002), http://www.irs.gov/pub/irs-news/ir-02-78.pdf.

**142.** Under the revised policy, the IRS would request TAWs associated with a listed transaction,[28] if the taxpayer's return "claim[ed] any tax benefit arising out of a transaction that the Service . . . determined to be a listed transaction at the time of the request[.]" (First Erickson Decl., Ex. 5.) If the taxpayer disclosed the listed transaction, the IRS stated that it would routinely request the taxpayer's TAWs pertaining only to the listed transaction. (*Id.*) If the listed transaction was not disclosed, the IRS would routinely request all of the taxpayer's TAWs. (*Id.*) In addition, if the IRS determined that the taxpayer claimed tax benefits from multiple investments in listed transactions on

---

[28] The term "listed transaction" is defined and discussed below.

a return, regardless of whether the taxpayer disclosed the transactions, the IRS, as a discretionary matter, would request all TAWs. (*Id.*) Similarly, if, in connection with the examination of a return claiming tax benefits from a disclosed listed transaction, there were reported financial accounting irregularities, the IRS, as a discretionary matter, would request all of the taxpayer's TAWs. (*Id.*)

143. Under this policy, the IRS did not request TAWs from most taxpayers. (Pagano Decl. ¶ 47.)

## LISTED TRANSACTIONS

144. A listed transaction is "a transaction that is the same as, or substantially similar to, a transaction that the IRS has determined to be an abusive tax avoidance transaction and identified as a listed transaction in a notice, regulation, or some other form of published guidance." (First Erickson Decl. ¶ 15; *see* Pagano Tr. 456:7-12); 26 C.F.R. § 1.6011-4(b)(2).

145. Since 2004, Wells Fargo has not taken tax deductions in originally filed tax returns for transactions that are, at that time, listed transactions. (Horton Tr. 188:15-25, 189:12-22, 191:18-22, 192:21-193:5.)

146. Wells Fargo has, however, claimed tax benefits from listed transactions at a later time, before the expiration of statutes of limitations, in order to preserve its rights to claim the tax benefits if it prevailed in pending litigation involving listed transactions. (Horton Tr. 250:7-251:18, 294:5-9.)

**147.** For example, on February 11, 2005, the IRS released a notice that it considered certain transactions known as "sale-in, lease-out" ("SILO") transactions to be listed transactions. (First Erickson Decl. ¶ 17, Ex. 6.) In 2005 and 2006, Wells Fargo did not include any tax benefits from its SILO transactions on its tax returns. (*Id.* ¶ 18.) At the end of the examination cycle, however, Wells Fargo filed an administrative refund claim alleging that it was entitled to losses for 2005 and 2006 for SILO transactions. (*Id.* ¶ 18; *see also* Erickson Tr. 633:2-23.)

**148.** Wells Fargo has not claimed the benefits of any listed transactions on its 2007 or 2008 federal income tax returns. (Horton Tr. 247:25-248:2.)

**149.** At the time the summonses in this case were issued, Wells Fargo had notified the IRS that it would potentially file refund claims for its SILO transactions in 2007 and 2008 in order to preserve refund claims in case it prevailed in pending litigation. (Horton Tr. 249:4-11, 294:10-295:4; Hager Decl., Ex. E; Erickson Tr. 633:24-634:12.) The IRS expected that Wells Fargo would claim these refunds. (First Erickson Decl. ¶ 18; Hager Decl., Ex. F.)

**150.** According to Erickson, the IRS chose to seek Wells Fargo's TAWs, at least in part, because of its participation in SILO transactions. (*See* First Erickson Decl. ¶ 22.) As noted above, Erickson primarily seeks Wells Fargo's TAWs to verify the accuracy of its tax returns.

**151.** Twenty-six of Wells Fargo's SILO transactions were litigated in the Court of Federal Claims, *Wells Fargo v. United States*, Docket No. 06-cv-628T. (First Erickson Decl. ¶ 19.) On January 8, 2010, the Court of Federal Claims ruled against Wells Fargo,

denying the SILO claim for a refund.  (*Id.* ¶ 19, Ex. 7.)  This decision was affirmed by the Federal Circuit on April 15, 2011.  *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1321 (Fed. Cir. 2011).  The Federal Circuit determined that Wells Fargo's SILO transactions were "abusive tax shelters" that "amounted to nothing more than tax deduction arbitrage."  *Id.* at 1330.

**152.**    Wells Fargo determined after its loss on appeal that it would not file refund claims for listed transactions in the 2007 and 2008 tax years.  (Horton Tr. 249:11-15; Hager Tr. 397:14-20.)

**153.**    On April 28, 2011, Wells Fargo wrote to the IRS and informed them that, because Wells Fargo lost its court case, Wells Fargo would not file a refund for any SILO transactions on its 2007 or 2008 federal income tax returns.  (Wells Fargo Trial Ex. 29; Hager Tr. 405:10-14.)

**154.**    In response to the April 28 letter, the IRS responded that it would not withdraw its summonses.  (Wells Fargo Trial Ex. 30.)

**155.**    In addition to listed transactions, the IRS claims that Wells Fargo has engaged in other abusive "tax avoidance transactions" in recent years.  (First Erickson Decl. ¶¶ 20-21.)

## IRS's MOTIVATIONS FOR ISSUING POLICY OF RESTRAINT

**156.**    Wells Fargo asserts that "[t]he purpose of the IRS's new policy of demanding tax accrual workpapers from taxpayers that engage in listed transactions is to

discourage engaging in such transactions, not to ensure that revenue agents can perform audits." (Pagano Decl. ¶ IV.[29])

157.    As support for this theory, Wells Fargo provided quotations from various individuals who served as Chief Counsel at the IRS, stating that the decision to demand TAWs in audits where "listed transactions" were involved was, in part, meant to discourage companies from engaging in listed transactions or transactions that may become listed transactions. (Pagano Decl. ¶ 45.)

158.    The Court finds that the quotations that Wells Fargo cites speak for themselves. (*See* Pagano Tr. 478:15-482:6; Pagano Decl. ¶ 45.) These statements do not show that the IRS's **sole** motivation in issuing the policy of restraint was to deter taxpayers from engaging in abusive transactions. For example, the quotation from IRS Deputy Chief Counsel Emily Parker states that "**one** of the purposes of the change in the IRS policy regarding requests for tax accrual workpapers is to cause corporate decision makers to 'think twice' before participating in transactions that are or may become listed transactions." (*See* Pagano Decl. ¶ 45 (emphasis added)). Instead, the quotations show

---

[29] The Court finds that, because Wells Fargo's expert, Pagano, retired from the IRS in 1983, his opinions about the modern-day motivations of the IRS in requesting TAWs are of minimal weight. (*See* Pagano Tr. 485:3-4.) Pagano further testified that, under the initial policy of restraint, he was "not aware of any basis for concluding that the IRS was unable to do its job effectively." (Pagano Decl. ¶ 41.) The Court also finds this statement to be of minimal weight because Pagano retired from the IRS in 1983 and does not have direct first-hand knowledge of struggles the IRS may have faced in auditing large companies such as Wells Fargo. (*See* Pagano Tr. 485:3-4.) Furthermore, the Court finds persuasive the testimony of IRS witnesses who stated that complex transactions can render it difficult to identify UTPs. (*See, e.g.*, Biafore Decl. ¶ 8 (noting that the IRS had previously discovered abusive tax avoidance transactions through its review of TAWs).)

that at least some IRS employees believed that one purpose in revising the policy of restraint was to deter potentially abusive tax transactions.

## AUDITORS AND KPMG

**159.** KPMG is Wells Fargo's outside financial statement auditor and has performed that role for well over twenty years. (Horton Tr. 241:23-25; Newinski Tr. 642:12-16.)

**160.** Auditors are independent accountants who test and challenge the accounting judgments reflected in financial statements. (Kelly Tr. 114:13-24; Kelly Decl. ¶¶ 9-10; Horton Tr. 242:4-10.)

**161.** The Public Company Accounting Oversight Board ("PCAOB") issues professional standards that govern how audits are conducted. (Kelly Decl. ¶ 10.) Auditing firms are regulated by the PCAOB. (Kelly Tr. 118:1-25.)

**162.** The body of standards issued by the PCAOB governing audits is known as Generally Accepted Auditing Standards ("GAAS"). (Kelly Decl. ¶ 10.) The PCAOB largely adopted the guidelines of the American Institute of Certified Public Accountants ("AICPA"). *See* 17 C.F.R. § 210.1-02(d), 240.13a-1; (Kelly Tr. 118:1-25, 122:19-21).

**163.** Auditors must conduct audits in accordance with GAAS. (Kelly Decl. ¶ 13.) Under GAAS, auditors must obtain reasonable assurances that financial statements are free of misstatements caused by error or fraud, including evidence regarding a company's reserve account for deferred and contingent tax liabilities. (*Id.*; Outslay Tr. 78:22-79:7; Newinski Tr. 645:1-16; Stevens Tr. 684:3-9.)

**164.** Under auditing standards, a public company's failure to provide its independent auditors with sufficient information regarding the company's tax accrual could negatively impact the auditor's ability to certify its financial statements. (Stevens Decl., Ex 2 (PCAOB, Auditing Standards AU §§ 9326.13 ¶¶ 2.06-2.14).)

**165.** Companies typically hire their own auditors. (Kelly Tr. 115:10-11.)

**166.** Auditors usually have a significant amount of interaction with the companies they audit and open access to company records. (Kelly Tr. 115:22-116:10.)

**167.** Laura Newinski, a partner and auditor at KPMG, testified that KPMG works "in a very collaborative way" with the companies it audits because obtaining full and accurate information is critical to conducting an audit. (Newinski Tr. 646:12-647:2.)

**168.** Under auditing standards, auditors must be objective and possess a "judicial impartiality." (Wells Fargo Trial Ex. 67 (PCAOB Auditing Standards AU ¶ 220.02); Kelly Tr. 117:1-119:20, 121:4-8; Kelly Decl. ¶ 8(i); Newinski Tr. 645:23-646:11.)

**169.** An auditor's goal must be to ensure that the company's financial statements fairly reflect the financial condition of the company and follow accounting rules and principles. (Kelly Tr. 115:12-21.)

**170.** If an auditor finds a problem with a company's financial statement, the typical practice is for the auditor to tell the company. The usual result is to come to a mutually agreeable solution between the auditor and the company before the company issues its financial statements. (Kelly Tr. 116:11-25.)

**171.** AICPA's Code of Professional Conduct states that the independence of an auditor "may be impaired whenever the covered member and the covered member's

client or its management are in threatened or actual positions of material adverse interests by reason of threatened or actual litigation." (Wells Fargo Trial Ex. 68 (AICPA Code ¶ 101.08).) The Code requires an auditor to disengage itself or disclaim an opinion because of a lack of independence in the event it concludes that "the actual or intended litigation poses an unacceptable threat to independence." (*Id.*; *see also* Wells Fargo Trial Ex. 68 (AICPA Code ¶¶ 101.12, .15).)

172. The SEC's Financial Reporting Policies ("FRP") similarly state that "[w]hen an adversary position between a client and its accountant with respect to the audit services rendered is created as a result of litigation, the accountant cannot be considered impartial or capable of exercising objective judgments in the performance of the audit work and could not be deemed to meet the Commission's requirements for independence." (Wells Fargo Trial Ex. 69 (FRP ¶ 602.02.f.ii).) Independence is impaired if litigation substantially alters the normal relationship between client and accountant, impairs the candor and communication between client and auditor regarding all aspects of the client's business operations, or creates bias on the part of the auditor. (*Id.*)

173. According to Wells Fargo expert Harvey Kelly, a financial consultant with expertise in auditing, litigation between auditors and clients occurs but is rare. (Kelly Decl. ¶ 29; Kelly Tr. 138:14-139:22.)

174. Litigation in regard to the duties an auditor performs for its client would impair the auditor's independence, while litigation over matters such as billing disputes generally would not impair independence. (Kelly Tr. 112:15-20; Kelly Decl. ¶¶ 30-31.)

**175.** In addition to the duty of independence, auditors also have a duty to, in most instances, keep client records confidential. (Kelly Tr. 132:3-135:9; Kelly Decl. ¶ 8(ii).) An auditor is bound by regulatory and ethical professional standards to keep client information confidential and is generally not permitted to disclose information to third parties under professional rules. (Kelly Tr. 112:21-25.) Auditors who breach confidentiality absent a legal duty to do so have violated professional standards and could incur various penalties, including losing their licenses. (*See id.* 135:10-25.)

**176.** Auditors often have confidentiality agreements with their clients. (Kelly Decl. ¶ 36; *see also id.* ¶ 39.)

**177.** Companies routinely provide information to auditors that they consider "proprietary, commercially and/or competitively sensitive, privileged, or otherwise confidential." (Kelly Decl. ¶ 32.)

**178.** If an audit firm receives a subpoena or summons asking it to disclose client information, the standard practice is for the audit firm to advise the client that it must either consent to production or exercise its legal rights to challenge the subpoena or summons. (Kelly Tr. 137:6-19; Kelly Decl. ¶ 35.) An auditor would not normally produce client information unless a client consented or a court ruled that the auditor must do so over a client's objection. (Kelly Tr. 137:6-23.)

**179.** However, there are circumstances in which an auditor will turn over information to outside parties. For example, the SEC has the authority to subpoena documents underlying a corporation's financial statements in order to determine whether

they contain material misstatements. 15 U.S.C. §§ 77s(c), 78u(b); *United States v. Arthur Young & Co.*, 465 U.S. 805, 820 & n.16 (1984).

**180.** The PCAOB also has broad authority, including the authority to demand an auditor's workpapers to determine whether the auditor has met professional standards. 15 U.S.C. § 7215(b)(2)(B).

**181.** Under the Sarbanes-Oxley Act, the PCAOB may suspend or revoke a public accounting company's registration for failing to cooperate in an investigation. 15 U.S.C. §§ 7215(b)(3), (c)(4); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 130 S. Ct. 3138, 3148 (2010); (Stevens Tr. 688:3-20).

## KPMG's RELATIONSHIP WITH WELLS FARGO

**182.** KPMG completes its audits of Wells Fargo's financial statements in February of the year following the tax year in issue. Thus, KPMG completed the 2007 audit in February 2008 and the 2008 audit in February 2009. (Newinski Tr. 666:1-7.)

**183.** As part of its 2007 and 2008 audits, KPMG requested Wells Fargo's assessments of each of its UTPs. Specifically, KPMG requested a complete listing of UTPs, FIN 48 tax reserves, and schedules that explained the amounts included in Wells Fargo's audited financial statements. (Newinski Tr. 649:7-22.)

**184.** As described above, Wells Fargo provided KPMG with individual UTP narratives, documentation, and spreadsheets to support its financial statements and disclosures. (Horton Tr. 244:18-245:2; Horton Decl. ¶¶ 54, 57-59.) KPMG also created

its own documentation and analysis of the FIN 48 information it received from Wells Fargo. (Newinski Tr. 658:2-25.)

**185.** As part of the 2007 and 2008 audits, KPMG assessed the risk of material misstatements in Wells Fargo's financial statements. (Newinski Decl. ¶ 16.) KPMG determined that Wells Fargo's inherent risk for significant misstatement of its accounting for UTPs was "moderate" because accounting for UTPs can require managerial judgment. (Newinski Tr. 669:11-17; Newinski Decl. ¶ 22.)

**186.** Wells Fargo and KPMG entered into a contract requiring that KPMG maintain the confidentiality of Wells Fargo's confidential information. (Horton Decl. ¶¶ 50, 55, Ex. D at 5-7; *see also* Newinski Tr. 661:20-662:6.) Wells Fargo expected KPMG to hold its records as confidential because of their engagement letter and professional standards. (Horton Tr. 244:7-13; Horton Decl. ¶ 55.) Wells Fargo personnel have "routinely and frequently" instructed KPMG to keep all of its TAWs, as well as any documents created as a result of any related communications between Wells Fargo and KPMG, confidential. (Newinski Tr. 661:20-662:3; *see also* Horton Tr. 364:10-17.)

**187.** However, Wells Fargo's agreement with KPMG acknowledged that "all information obtained or created" by KPMG auditors "will be available . . . for examination by governmental agencies having jurisdiction over Wells Fargo's business, including all U.S. government agencies having regulatory jurisdiction over Wells Fargo." (Horton Decl., Ex. D at 12-13.) Wells Fargo also acknowledged that any KPMG

workpapers for Wells Fargo that were made available to the PCAOB could be copied and distributed to other regulators, such as the SEC. (*Id.*)[30]

**188.** Newinski testified that, to her knowledge, KPMG had not granted access to Wells Fargo's TAWs to outsiders. (Newinski Tr. 661:6-19; Newinski Decl. ¶ 46.) KPMG took many steps to protect client confidentiality, such as providing training and locking confidential materials in a limited access room. (Newinski Tr. 662:7-664:1.)

**189.** There has been no litigation between Wells Fargo and KPMG. (Newinski Tr. 664:2-9.) Newinski also believes that there was no reasonably foreseeable circumstance in which KPMG would use TAWs against Wells Fargo in litigation. (Newinski Decl. ¶ 47.)

**190.** Horton described Wells Fargo's relationship with KPMG as "cooperative and professional," and said Wells Fargo views KPMG as an "independent expert." (Horton Decl. ¶ 53.) He also stated that KPMG has never expressed concerns that Wells Fargo's UTPs were unreasonable. (*Id.* ¶¶ 51, 62.) Newinski stated that she believes Wells Fargo has the same goal that KPMG possesses in completing its work, which is ensuring that Wells Fargo's financial statements adequately comply with GAAP. (Newinski Tr. 645:17-22.)

---

[30] The agreement also stated, "[i]n the case of illegal acts which, in [KPMG's] judgment would have a material effect on the consolidated financial statements of Wells Fargo, [KPMG is] also required to follow the procedures set forth in the Private Securities Litigation Reform Act of 1995, which under certain circumstances requires [KPMG] to communicate [its] conclusions to the SEC." (Horton Decl., Ex. D at 175.)

## ATTORNEY-CLIENT PRIVILEGE

**191.** Wells Fargo has asserted the attorney-client privilege as a basis for protecting eight documents from disclosure to the IRS. (*See* Wells Fargo Trial Ex. 18 ¶¶ 1(c), 3(b); Wells Fargo Sealed Documents 25-28, 35-37, 98; Horton Tr. 268:21-269:2, 279:2-280:3; Hager Decl. ¶¶ 4-5.)

**192.** None of these documents were copied or provided to KPMG or any other outside party. (*See* Wells Fargo Trial Ex. 8.)

**193.** Three of the e-mails that Wells Fargo seeks to protect relate to drafts of TAWs. (*See* Wells Fargo Trial Ex. 18 ¶ 1(c).) These e-mails identify UTPs and have drafts of UTP cover sheets, including recognition and measurement analyses, attached to them.

**194.** Three of the e-mails discuss the applicability of work-product protection and the attorney-client privilege to Wells Fargo's TAWs. (*See* Wells Fargo Trial Ex. 18 ¶ 3(b)(i).) These e-mails detail legal advice from Wells Fargo's attorneys regarding the applicability of the privileges.

**195.** The last two e-mails discuss issues related to the settlement of UTPs, one of which pertains to negotiations with respect to a state tax issue. (*See* Wells Fargo Trial Ex. 18 ¶ 3(b)(ii).)

**196.** At least one Wells Fargo in-house lawyer is a sender or recipient of each e-mail that Wells Fargo seeks to protect under the attorney-client privilege.

## STATE AND LOCAL TAWs

197. Wells Fargo separately identifies state UTPs and federal UTPs. (Newinski Tr. 659:21-660:16.)

198. State UTPs can produce a federal tax deduction. (Newinski Tr. 659:21-660:12.) Hager testified that the only relevance of state law information to federal tax liability is the taxes actually paid and deducted on the federal return. (Hager Tr. 405:2-6.)

199. Biafore testified that state and local TAWs might shed light on the correctness of a federal tax return to help identify how the taxpayer came to their state income tax number. (Biafore Tr. 807:9-19.)

200. On cross examination, however, Biafore stated that with respect to a taxpayer such as Wells Fargo, which deducts state and local taxes based on the amount of taxes paid, all the IRS needs to do to verify the deduction for state and local taxes would be to "pull up all [the] state returns and match up the payments." (Biafore Tr. 849:2-851:7.) In that circumstance, Biafore stated that state and local TAWs are irrelevant. (*Id.* 851:1-4, 849:6-8 ("Q. If the IRS can verify the deduction for state taxes, is it your opinion that [state and local TAWs] are not relevant? A. Pretty much, yes.").)

201. Erickson stated that information about state and local taxes may reveal inconsistencies in positions Wells Fargo takes in its federal, as opposed to state and local, tax returns. (First Erickson Decl. ¶ 29.) He did not provide an example of such a potential inconsistency, however.

**202.** Wells Fargo has litigated a California franchise tax issue with the IRS. (Horton Tr. 290:1-7.) The issue litigated was whether an item was deductible for federal income tax purposes, so Wells Fargo treated this issue as related to a federal tax position. (*Id.* 290:8-13.)

## WACHOVIA TAWs

**203.** Wells Fargo's acquisition of Wachovia closed on December 31, 2008. (Horton Tr. 145:23-25.)

**204.** Although December 31, 2008, was the last day of the 2008 tax year, Wachovia filed its own separate consolidated federal income tax returns for 2007 and 2008. (Hager Decl. ¶ 42; Horton Decl. ¶ 9.)

**205.** The IRS's examination plan for Wells Fargo did not include Wachovia. (Wells Fargo Trial Ex. 40 at 8, 128-38 (showing schedule containing a "complete list" of Wells Fargo subsidiaries included in 2007 and 2008 examination, which does not include Wachovia).)

## CONCLUSIONS OF LAW

To determine whether the summonses are enforceable, the Court must consider each of Wells Fargo's challenges to the summonses. First, the Court will find that the IRS had a proper purpose in requesting Wells Fargo's TAWs. Second, the Court will determine that Wells Fargo's identification of UTPs is not entitled to work product protection but that Wells Fargo's recognition and measurement steps are protected. Third, the Court will find that eight of Wells Fargo's documents are protected by the

attorney-client privilege.  Finally, the Court will find that the United States has not shown the potential relevance of Wells Fargo's state and local TAWs or Wachovia's TAWs.

## I.    STANDARD OF REVIEW

Pursuant to 26 U.S.C. § 7602, the IRS is authorized "[t]o examine any books, papers, records, or other data which may be relevant or material to" ascertaining the correctness of any return.  26 U.S.C. § 7602(a)(1).  The IRS may issue a summons in order to obtain this information and may petition the District Court to enforce the summons.  *Id.* §§ 7602(a)(2), 7604(b).  The IRS may also summon individuals to testify under oath about information relevant to the correctness of a return.  *Id.* § 7602(a)(2).

The IRS has "broad latitude to adopt enforcement techniques helpful in the performance of [its] tax collection and assessment responsibilities."  *Arthur Young & Co.*, 465 U.S. at 820 (quoting *United States v. Euge*, 444 U.S. 707, 716 n.9 (1980)).  "[I]t is for the agency, and not the taxpayer, to determine the course and conduct of an audit."  *United States v. Norwest Corp.*, 116 F.3d 1227, 1233 (8th Cir. 1997).  Section 7602 reflects a congressional policy in favor of disclosure of information relevant to legitimate inquiry by the IRS and gives "expansive information-gathering authority" to the IRS.  *Arthur Young & Co.*, 465 U.S. at 816.

In order to enforce a summons, the IRS must show that (1) its investigation is pursuing a legitimate purpose; (2) the inquiry "may be relevant" to that purpose; (3) the information sought is not already in the possession of the IRS; and (4) the administrative

steps required by the Internal Revenue Code have been followed. *United States v. Powell*, 379 U.S. 48, 57-58 (1964).

"The [IRS] Commissioner may establish a prima facie case for enforcement of a summons by a minimal showing of good faith compliance with summons requirements." *United States v. Norwood*, 420 F.3d 888, 892 (8th Cir. 2005) (internal quotation marks omitted). Once the IRS has met its initial burden, "[t]he taxpayer can rebut a prima facie case for enforcement under *Powell* by demonstrating that the *Powell* requirements have not been satisfied, or by showing that enforcement of the summons would represent an abuse of the court's enforcement powers." *Id.* at 893. Contravening a privilege – such as the work product or attorney-client privilege – constitutes an abuse by the IRS of the court's enforcement powers. *See United States v. Wyatt*, 637 F.2d 293, 301 (5th Cir. 1981) ("Such an abuse would occur . . . where enforcement would contravene the attorney-client privilege, or the privilege against self-incrimination . . . ." (citing *Reisman v. Caplin*, 375 U.S. 440, 449 (1964); *Couch v. United States*, 409 U.S. 322, 327 (1973))).

Wells Fargo argued prior to the evidentiary hearing in July 2011 that the IRS was required to establish the right to enforcement under *Powell* at the evidentiary hearing, and only then would the burden shift to Wells Fargo to rebut the government's prima facie case. However, as the Eighth Circuit recognized:

> [T]he burden on the IRS to make a prima facie showing as to the *Powell* good faith requirements is slight, and the burden on the challenger to rebut the IRS showing as to one or more of these requirements or to demonstrate that judicial enforcement of the summons would otherwise constitute an abuse of the court's process is great.

*Robert v. United States*, 364 F.3d 988, 996 (8th Cir. 2004) (internal quotation marks omitted). Applying this standard, on July 20, 2011, this Court held that the IRS had established a prima facie case of good faith under *Powell*. (Docket No. 104.)[31] Thus, the burden fell to Wells Fargo to establish that the IRS lacked a legitimate purpose in enforcing the summonses or that enforcement of the summonses would constitute an abuse of the Court's process.[32] The Court further noted that, even without the *Powell* analysis, Wells Fargo would bear the burden of proof on the issue of privilege. (Docket No. 104 at 5 (quoting *In re Zurn Pex Plumbing Prods. Liab. Litig.*, MDL No. 08-1958, 2009 WL 1178588, at *1 (D. Minn. May 1, 2009) ("A party asserting the attorney-client privilege or protection under the work-product doctrine has the burden to provide a factual basis for the privilege or protection." (internal citation omitted))). The Court will thus apply the burdens identified in this previous Order.

---

[31] The Court further finds that the United States established a prima facie case under *Powell* during the evidentiary hearing, for the reasons outlined below. The only exceptions, where the United States has not made a prima facie case under *Powell*, are for TAWs related to state and local taxes and Wachovia's tax liability. The Court will separately discuss these issues below.

[32] In its July 20, 2011, Order, the Court held that the parties should focus on work product privilege and not the IRS's allegedly improper purpose. (Docket No. 104 at 3.) At the evidentiary hearing, however, the parties each submitted substantial evidence on the issue of legitimate purpose and the Court did not restrict the admission of such evidence. The Court will therefore address the issue of the IRS's legitimate purpose in this Order.

## II.     LEGITIMATE PURPOSE

### A.     Standard of Review

Wells Fargo first challenges the summonses by claiming that the IRS lacked a legitimate purpose in issuing them.  It is improper to issue summonses for certain purposes, such as to harass a taxpayer or put pressure on a taxpayer to settle a collateral dispute.  *See Powell*, 379 U.S. at 58.  To establish that the summonses lacked a legitimate purpose, Wells Fargo was required to "disprove the actual existence of a valid civil tax determination or collection purpose by the Service."  *See United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978).  This burden is a "heavy" one.  *Norwood*, 420 F.3d at 893 (citing *United States v. Kaiser*, 397 F.3d 641, 643 (8th Cir. 2005)).

The Court will explain that the IRS has established a legitimate purpose for the issuance of the summonses: verifying the accuracy of Wells Fargo's tax returns.  There appears to be no equally effective means of verifying this information and, even if there were other means, the existence of other methods would not overcome the legitimacy of the summonses.  Furthermore, the Court will conclude, based on the evidence presented, that the United States was not motivated to deter or punish Wells Fargo and that the IRS's potential violation of the policy of restraint does not render the IRS's purpose illegitimate.

### B.     Verifying Accuracy of Tax Returns

The Court finds that the IRS has established a legitimate purpose in requesting Wells Fargo's TAWs in this case.   Specifically, the IRS had a legitimate purpose to issue

the summonses "to verify that [Wells Fargo's] tax return was substantially correct." (*See* Erickson Tr. 637:3-6.) Wells Fargo failed to disprove the legitimacy of that purpose.

The TAWs at issue would illuminate aspects of Wells Fargo's tax returns or, at the very least, be potentially relevant to learning more about Wells Fargo's returns. Indeed, a unanimous United States Supreme Court has found that TAWs can be "highly relevant" to IRS inquiry in at least some cases. *Arthur Young & Co.*, 465 U.S. at 815. Wells Fargo's tax returns and UTPs are complex. United States witnesses Biafore and Erickson established that requesting TAWs can – and, in at least one case involving Biafore, did – allow the IRS to discover tax positions it would not otherwise find. Given the complexity of Wells Fargo's tax positions and returns, the IRS was within its discretion in requesting the TAWs. *See id.* at 814 (stating that the language "may be relevant" in that § 7602 "reflects Congress' express intention to allow the IRS to obtain items of even potential relevance to an ongoing investigation, without reference to its admissibility").[33]

---

[33] Furthermore, the mere fact that the IRS may – unbeknownst to the IRS – already be aware of the underlying tax positions that Wells Fargo has identified in its FIN 48 analysis does not render its summonses improper under any of *Powell*'s requirements, including the third requirement that the IRS may not summon information already in its possession. The IRS attested that it does not possess Wells Fargo's TAWs or any of the other information it seeks. Thus, the burden shifts to Wells Fargo to show, at a minimum, "actual possession of the information by the IRS." *See United States v. Davis*, 636 F.2d 1028, 1037 (5th Cir. 1981). Wells Fargo has not met this burden, nor has it argued that the IRS failed to meet the third factor of its prima facie case under *Powell*. Furthermore, the fact that the IRS may possess some of the information it seeks does not invalidate the summonses because the IRS has no way to exclude from its request information which it unknowingly possesses. *See id.* at 1037-38 (holding that the IRS may request information it already possesses in pursuit of an "effective investigation," as long as the need for this investigation outweighs any unnecessary harassment of the taxpayer); *United States v. John G. Mutschler & Assoc., Inc.*, 734 F.2d 363, 368 (8th Cir. 1984).

The IRS's request was also proper because Wells Fargo has claimed tax benefits from listed transactions and engaged in other questionable tax practices in the past. As noted above, the Federal Circuit held that Wells Fargo improperly claimed tax deductions stemming from SILO transactions. *Wells Fargo & Co. v. United States*, 641 F.3d 1319, 1320-21 (Fed. Cir. 2011). Wells Fargo has been found to engage in other abusive tax avoidance techniques, as well. *See WFC Holdings Corp. v. United States*, Civ. No. 07-3320, 2011 WL 4583817, at *48 (D. Minn. Sept. 30, 2011) ("WFC has not shown that the [lease restructuring transaction], viewed as a whole, had economic substance or a real purpose other than tax avoidance."). Particularly because Wells Fargo has engaged in questionable tax practices in the past, the IRS had a legitimate purpose in requesting TAWs to help verify the accuracy of Wells Fargo's tax returns. *See Merck & Co. v. United States*, 652 F.3d 475, 488 (3d Cir. 2011) ("To the extent that the IRS pursued [the taxpayer] more vigorously because [the taxpayer] had a history of failing to comply with the tax laws, this represents commendable agency diligence in the light of past experience, not some kind of impermissible bias against [the taxpayer].").

## C.     Other Techniques for Verifying Accuracy of Returns

Wells Fargo argues that the IRS did not have a proper purpose in issuing the summonses because there were other methods the IRS could have used to verify the accuracy of Wells Fargo's tax returns. Wells Fargo focuses primarily on the Schedule M-3, arguing that reviewing this form would have allowed the IRS to identify Wells Fargo's UTPs. The Schedule M-3, which corporate taxpayers with total assets of $10

million or more must complete as a part of their tax return, requires taxpayers to reconcile their book-tax differences as part of their tax return. (Pagano Decl. ¶ 32.) Specifically, Schedule M-3 requires taxpayers to provide a complete reconciliation of financial accounting net income or loss to taxable income or loss in a standardized and detailed format. (*Id.*) Wells Fargo also points to the Reportable Transaction Disclosure Statement ("Form 8886") as a useful technique for the IRS in discovering abusive tax transactions. (Pagano Decl. ¶ 35.) Form 8886 requires corporations to disclose "reportable" transactions, including "listed" transactions, as part of their tax returns. (*Id.*)

The Court concludes that Wells Fargo has not established that the Schedule M-3 and Form 8886 would necessarily allow the IRS to identify all transactions related to the UTPs. Multiple sources support the fact that the Schedule M-3 will not always lead the IRS to identify UTPs,[34] and the Form 8886 only lists certain types of transactions. Thus,

---

[34] *See, e.g.*, Adam M. Braun, Note, *Open Reserve-ations?:* United States v. Textron Inc. *and Its Application to International Tax Accounting*, 86 Notre Dame L. Rev. 823, 840 n.113 (2011) ("While new efforts to make tax positions more transparent, such as the requirement to complete Schedule M-3 . . . , assist in locating evasive tax shelters, the IRS cannot possibly examine and understand an entity's tax positions from these forms alone."); J. Richard Harvey, Jr., *Schedule UTP: An Insider's Summary of the Background, Key Concepts, and Major Issues*, 9 DePaul Bus. & Com. L.J. 349, 355 (2011) ("Schedule M-3 was not designed to directly disclose all material issues to the IRS [and] [i]n many cases, Schedule M-3 will not provide any clue there is a tax issue."). Although Wells Fargo's expert, Pagano, disagreed with these opinions, the Court finds that he did not sufficiently or specifically address the IRS's assertion that tax shelters have become more sophisticated and thus that certain tax positions might not be identified. (*See* Pagano Tr. 482:25-483:8, 486:10-490:18); *see also* Dennis J. Ventry, Jr., *A Primer on Tax Work Product for Federal Courts*, 123 Tax Notes, 875, 881 (2009), http://ssrn.com/abstract=1405523 ("In these cases of ambiguity, tax accrual workpapers help the IRS to verify the accuracy and completeness of return positions, clarify turbid facts and data, reveal unidentified issues and positions, and expose information hidden from view on transaction documents.").

Wells Fargo has not established that the Schedule M-3 or Form 8886 would allow the IRS to identify all tax positions that warrant further investigation.

In addition, Wells Fargo's expert, Walter Pagano, suggested that documents like the Schedule M-3 might make only a piece of a transaction apparent to the IRS, requiring follow-up with other investigative techniques. (Pagano Tr. 466:20-23.) These other techniques include requesting source documents and the internal documents that a company used in preparing and analyzing a transaction. (Pagano Decl. ¶ 33; Pagano Tr. 464:12-465:18; *see also* United States Trial Ex. 46 at 2.) These are the types of documents that Wells Fargo might seek to classify as work product or attorney-client privileged if the documents involved attorneys and the identification and analysis of UTPs. For this additional reason, Wells Fargo has not shown that the Schedule M-3 or other forms will serve as a definite substitute to requesting Wells Fargo's TAWs and UTPs.

Furthermore, the IRS need not prove that TAWs are "critical" to its ability to discover Wells Fargo's tax positions. (*See* Pagano Decl. ¶ IV.) Under *Powell*, to establish that TAWs are relevant to an audit, the Court need determine merely that the TAWs might shed some light on the tax return. *See Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 323 (1985); *Norwest Corp.*, 116 F.3d at 1233 ("The issue . . . is not whether the IRS **needs** the . . . material . . . but whether the summoned material might 'illuminate any aspect of the return.'" (emphasis in original) (quoting *Arthur Young & Co.*, 465 U.S. at 815)). For the reasons already described, this standard easily is met here. The availability of other investigative techniques, particularly techniques that

might be less effective or supplementary, does not render improper the IRS's purpose in requesting relevant information.

### D.     Alleged Other Motives

Wells Fargo argues that the IRS's purpose in requesting TAWs was to "punish," or at a minimum deter, Wells Fargo's behavior because it enters into transactions that the IRS dislikes. Wells Fargo has not persuaded that Court that the IRS had this purpose in requesting the TAWs, and even if the IRS's purpose was, in part, to deter questionable tax practices, the IRS has nonetheless established a proper purpose for its summonses.

First, Wells Fargo has not established that the IRS intended to "punish" or even deter Wells Fargo through the issuance of the summonses. No final decisionmaker on the issuance of the summonses was present at the evidentiary hearing to testify about his or her motivations. Erickson, the IRS's senior team coordinator for Wells Fargo's 2007 and 2008 returns, testified, reliably, that his motivation in requesting Wells Fargo's TAWs was to verify the accuracy of Wells Fargo's tax returns. His primary concern in reviewing the TAWs from Wells Fargo would be to ensure that the IRS had identified all tax issues that might deserve more attention from the IRS. In addition, Erickson does not believe there is "anything wrong" with Wells Fargo pursuing a refund for its tax positions, showing his lack of any intent to punish Wells Fargo. Furthermore, Biafore, although not directly involved in the examination of Wells Fargo, described how TAWs could help IRS agents identify issues on tax returns. In Biafore's opinion, the IRS reviews TAWs to help identify issues that have not been discovered in an IRS

examination. Thus, the evidence strongly suggests that the IRS's motivation in issuing the summonses was to identify Wells Fargo's UTPs. The Court finds no persuasive evidence of the IRS's intent to "punish" Wells Fargo.

The primary evidence that Wells Fargo offers to support its position that the IRS was motivated to punish Wells Fargo is quotations from the Chief Counsel at the IRS stating that **one** purpose, not the sole purpose, of issuing the policy of restraint was to deter taxpayers from pursuing abusive tax avoidance techniques. The Court finds these quotations to be of minimal relevance to determining if the IRS, in this particular case, was motivated by a desire to deter – much less punish – tax avoidant behavior. For the reasons already outlined, the Court finds that there was no such improper motivation in this case.

Even if deterring tax avoidant behavior was one motivating factor in issuing the summons, however, this fact would not establish that the summonses were improper. As long as there is a legitimate purpose in issuing a summons, the existence of another purpose does not render the summons illegitimate. *See Tiffany Fine Arts*, 469 U.S. at 318 n.5 ("[A]ll that matters is that the IRS was pursuing a legitimate investigation," therefore "it is irrelevant whether [the IRS's legitimate purpose] was the IRS's primary or secondary purpose.").[35] This is particularly true here where the IRS's alleged second

---

[35] *Accord Norwood*, 420 F.3d at 894 ("Even [if] an IRS summons may not issue for 'solely' a criminal investigative purpose, the summons in this case would not represent an abuse of the court's process, because the IRS had a non-criminal purpose in summoning [defendant]."); *United States v. Barter Sys., Inc.*, 694 F.2d 163, 169 (8th Cir. 1982) (finding "no indication" that

(Footnote continued on next page.)

motive, attempting to deter a taxpayer from avoiding its tax obligations, is consistent with the overall purpose of the Internal Revenue Code – namely, collecting the amounts lawfully owed to the United States.[36]  *See, e.g.*, 26 U.S.C. § 7602(a) (providing summons authority to "determin[e] the liability of any person for any internal revenue tax").  The Court thus declines to find that the IRS possessed an improper purpose in issuing the summonses.

### E.    Policy of Restraint

Wells Fargo also argues that the IRS lacked a legitimate purpose because it violated its policy of restraint.  (*See* First Erickson Decl., Ex. 5.)  The policy of restraint stated that the IRS would request TAWs only if a taxpayer had claimed the benefits of a listed transaction on its tax return.  Wells Fargo argues that, because it did not claim the benefits of a listed transaction on its 2007 or 2008 returns, the IRS violated its policy of restraint.  Even assuming that the IRS violated its policy of restraint,[37] the Court concludes that the IRS has shown a legitimate purpose under *Powell*.

_____

(Footnote continued.)

Congress intended to limit the issuances of summons that had dual purposes, including a legitimate purpose).

[36] Furthermore, the Court finds that, at most, the quotations offered by Wells Fargo show a motivation to deter tax avoidant behavior – not a desire to punish taxpayers.

[37] The Court declines to decide whether the IRS has in fact violated the policy of restraint – currently or at the time it issued the summonses – because it is unnecessary to the disposition of this matter.  The Court notes, however, that it is possible that the IRS did not violate the policy of restraint because Wells Fargo had filed a claim for refund of tax benefits relating to SILO transactions during the 2005/2006 examination cycle, and, at the time that the summonses were

(Footnote continued on next page.)

As a preliminary matter, the Court notes that the policy of restraint does not purport to be an interpretation of the law or a definition of "legitimate purpose." Rather, it is a stated intention regarding when the IRS planned to seek certain information. However, even if the IRS intended its policy of restraint to define the bounds of its authority to demand TAWs, the policy would be "worth no more than its inherent persuasive value." *See Godinez-Arroyo v. Mukasey*, 540 F.3d 848, 850 (8th Cir. 2008) (quoting *Kai v. Ross*, 336 F.3d 650, 655 (8th Cir. 2003)).[38] The Court is not persuaded that the IRS must abide by the policy of restraint in order to have a legitimate purpose to request TAWs. Rather, for the reasons outlined above, the Court finds that the IRS's request had a legitimate purpose and met the requirements of *Powell*, regardless of the fact that the requests may not have complied with the policy of restraint.

In addition to the fact that the policy of restraint provides stricter boundaries on the IRS's authority than are necessary under the Supreme Court's holding in *Powell*, the Court finds the policy unpersuasive because of the IRS's "somewhat inconsistent posture" on when it will request TAWs. *See Morton v. Ruiz*, 415 U.S. 199, 237 (1974).

---

(Footnote continued.)

issued, Wells Fargo stated that it might file a similar refund claim for the 2007/2008 cycle. *See PAA Mgmt., Ltd. v. United States*, 962 F.2d 212, 219 (2d Cir. 1992) ("[W]e have in the past looked to the date of issuance of the summons in determining its validity under section 7602.").

[38] *See also Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000) ("Interpretations such as those in opinion letters – like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law – do not warrant *Chevron*-style deference."); *Groder v. United States*, 816 F.2d 139, 142 (4th Cir. 1987) (holding that the violation of an IRS Manual guideline that does not confer substantive rights or privileges on the taxpayer is "without legal effect to quash a summons").

The IRS has changed its position numerous times on when it will request UTPs and TAWs, including a decision in 2010 to implement a "Schedule UTP," on which certain corporations are required to report their UTPs as part of their tax return. *See Uncertain Tax Positions - Modified Policy of Restraint*, Mar. 23, 2011, http://www.irs.gov/ Businesses/ Corporations/Uncertain-Tax-Positions - Modified-Policy-of-Restraint; *Uncertain Tax Positions - Schedule UTP*, http://www.irs.gov/Businesses/ Corporations/ Uncertain-Tax-Positions -Schedule-UTP.

The IRS has shown a legitimate purpose for requesting Wells Fargo's TAWs, for the reasons outlined above, including that it wished to verify the accuracy of Wells Fargo's tax returns and that it knew Wells Fargo had claimed tax benefits from listed transactions and engaged in other questionable tax practices in the past. Accordingly, the Court will not quash the IRS's summonses on this basis.

## III.    WORK PRODUCT PRIVILEGE

### A.    Standard of Review

Wells Fargo next claims that it is entitled to work product protection for certain information in its TAWs. (*See* Wells Fargo Trial Ex. 18 ¶¶ 1(a-c), 2(a-b), 3(a-c), 5(1a-3a), 5(5), 6(a).) A party need not respond to an IRS summons with information protected by the work product privilege. *Upjohn Co. v. United States*, 449 U.S. 383, 398 (1981).

The work product privilege doctrine was established in *Hickman v. Taylor*, 329 U.S. 495 (1947). The doctrine is now outlined in Federal Rule of Civil Procedure 26(b)(3), which states, "[o]rdinarily, a party may not discover documents and tangible

things that are **prepared in anticipation of litigation** or for trial by or for another party or its representative." (emphasis added). Work product consists not only of "'tangible material' but also of 'its intangible equivalent in unwritten or oral form.'" *United States ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 478 (D. Utah 2001) (quoting Restatement (Third) of the Law Governing Lawyers § 87 (2000)). Excluded from work product are "[m]aterials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation purposes." Proposed Amendments to the Federal Rules of Civil Procedure Relating to Discovery, 48 F.R.D. 487, 501 (1970). The party asserting the privilege bears the burden of establishing that the information it seeks to protect was prepared in anticipation of litigation. *PepsiCo, Inc. v. Baird, Kurtz & Dobson LLP*, 305 F.3d 813, 817 (8th Cir. 2002).

There are two types of work product: "opinion work product," which contains the mental impressions, conclusions, opinions, or legal theories of an attorney, and "ordinary work product," which is any other work product, such as raw factual information strategically selected or organized by an attorney. *See In re Murphy*, 560 F.2d 326, 329 n.1 (8th Cir. 1977).[39] If ordinary work product is prepared in anticipation of litigation, it is not discoverable unless the party seeking discovery has a substantial need for the

---

[39] For example, a computer tape that contained data strategically selected by counsel qualified as ordinary work product. *In re Chrysler Motors Corp. Overnight Evaluation Program Litig.*, 860 F.2d 844, 846 (8th Cir. 1988) ("The computer tape was prepared by counsel in anticipation of litigation and reflects counsel's selection of certain categories of information from the gate passes that counsel believed would be relevant for trial preparation. As such, the computer tape is a 'compendium of relevant evidence prepared by the attorney.'" (citation omitted)).

material and cannot obtain the substantial equivalent through other means. *Id.* at 334.

The party seeking discovery bears the burden of showing a substantial need and undue

hardship. *Baker v. Gen. Motors Corp.*, 209 F.3d 1051, 1054 (8th Cir. 2000). Opinion

work product, in contrast, "enjoys a nearly absolute immunity and can be discovered only

in very rare and extraordinary circumstances." *In re Murphy*, 560 F.2d at 336.

To establish that it anticipated litigation at the time that it created the work

product, Wells Fargo need not demonstrate that litigation was already in progress. *See*

*Hickman*, 329 U.S. at 498, 514 (providing work product protection to documents created

by an attorney retained three days after the sinking of a tug boat, where litigation against

the tug boat owners was highly likely but had not yet begun). On the other hand, "the

work product rule does not . . . come into play merely because there is a remote prospect

of future litigation" or because an issue "might ultimately result in litigation of some sort

in the future." *Diversified Indus., Inc. v. Meredith*, 572 F.2d 596, 604 (8th Cir. 1977),

*modified on other grounds on reh'g*, 572 F.2d 606 (8th Cir. 1978) (en banc); *see also Folk*

*v. State Farm Mut. Auto. Ins. Co*., No. 4:10-CV-574 HEA, 2010 WL 3620477, at *2 n.1

(E.D. Mo. Sept. 9, 2010). To receive work product protection, documents must be

prepared after a "specific threat" of litigation became "palpable." *Black v. Pilot Travel*

*Ctrs., LLC*, No. CIV. 09-4170-KES, 2011 WL 1828039, at *2 (D.S.D. May 12, 2011).

If litigation is anticipated, circuit courts vary in the precise standard they use to

determine if materials are considered "prepared in anticipation of litigation" and thus

protected by the work product privilege. In the Eighth Circuit, materials are considered

"prepared in anticipation of litigation" if they are created "**because of**" litigation.

*PepsiCo, Inc.*, 305 F.3d at 817. The Circuit outlined this standard in *Simon v. G.D. Searle & Co.*, 816 F.2d 397 (8th Cir. 1987).

*Simon* involved a company that had multiple products liability actions pending against it. *Id.* at 398. The company created risk management documents to anticipate the costs of claims upon which it had already received a "notice of a claim or suit." *Id.* at 400. These documents had information about attorneys' estimates of anticipated legal expenses, settlement values, lengths of time to resolve litigation, and other factors. *Id.* at 400-01. The company used this information to set a case reserve for each of the outstanding claims. *Id.* at 400.

The Court held that aggregate case reserve information in the company's documents was not work product because it did not reveal figures for individual cases and revealed a lawyer's thoughts, at best, "in an indirect and diluted manner." *Id.* at 401-02. The Court held that some information in the documents was protected, however. Specifically, the Court held:

> Although the risk management documents were not themselves prepared in anticipation of litigation, they may be protected from discovery to the extent that they disclose the individual case reserves calculated by [Defendant]'s attorneys. The individual case reserve figures reveal the mental impressions, thoughts, and conclusions of an attorney in evaluating a legal claim. By their very nature they are prepared in anticipation of litigation and, consequently, they are protected from discovery as opinion work product.

*Id.* at 401. Thus, the Court concluded that the company was required to disclose its aggregate data but could redact individual case data from the documents as protected work product. *Id.* at 405 n.9.

*Simon* establishes that information closely related to an attorney's legal thinking about an individual case – including attorneys' estimates of anticipated settlement values – is protected by the work product privilege even if disclosed within business documents. *See id.* at 401.[40] It also shows that certain factual data that does not reveal an attorney's legal opinions, such as the overall cash reserves in *Simon*, are not protected from discovery; rather, this information may be disclosed while any protected information in the same documents is redacted. *See id.* at 401-02.

**B.    Application of Work Product Doctrine to the Summonses**

The Court must determine how the work product doctrine applies to the summonses at issue. First, the Court will find that Wells Fargo's identification of UTPs and factual information related to those UTPs is not protected by the privilege because this information was created in the ordinary course of business and not in anticipation of litigation. Second, the Court will determine that the recognition and measurement analysis sought by the summonses is work product because it involves legal analysis

---

[40] *Simon* gave some indication that documents created for business purposes do not qualify for work product protection, even if they contain information about litigation by stating, "even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of litigation." *See Simon*, 816 F.2d at 401 (quoting 8 C. Wright & A Miller, *Federal Practice and Procedure* § 2024, at 198-99 (1970)). However, ultimately, the Court held, "[a]lthough the risk management documents **were not themselves prepared in anticipation of litigation**, they may be protected from discovery to the extent that they disclose the individual case reserves calculated by [Defendant]'s attorneys." *Id.* (emphasis added).

prepared in anticipation of litigation.[41] Third, the Court will explain why KPMG's TAWs and testimony are protected to the same extent as Wells Fargo's TAWs and testimony. Fourth, the Court will explain that the IRS has not shown extraordinary circumstances entitling it to Wells Fargo's work product. Finally, the Court will specify which content Wells Fargo and KPMG must disclose in documents that Wells Fargo alleges are protected by the work product privilege.[42]

### 1. UTPs and Corresponding Information

The Court must determine if Wells Fargo's UTPs and the factual information surrounding them are protected by the work product privilege. The IRS summoned Wells Fargo's TAWs, but it also – and, in fact, primarily – seeks the identification of Wells Fargo's UTPs. In accordance with this goal, the IRS issued summonses seeking copies of Wells Fargo's TAWs, including its documentation of UTPs, and directing Wells Fargo to produce a witness or witnesses to testify about the contents of the TAWs and "the procedure and process by which Wells Fargo complied with FIN 48 for its years [ending in 2007 and 2008], including, but not limited to, the procedure and process used to

---

[41] The fact that some of the information in the TAWs is protected does not establish that their entire contents are not discoverable. *Simon*, 816 F.2d at 401-02; *Deloitte LLP*, 610 F.3d at 139 (remanding for determination of whether TAWs were entirely work product, or whether partial or redacted versions of the TAWs should be disclosed).

[42] The Court finds, as Wells Fargo concedes, that the aggregate data Wells Fargo already disclosed to the United States is not protected because it does not identify individual case information. *See Simon*, 816 F.2d at 401-02.

identify UTPs."[43]  Wells Fargo asserts that this information is protected by the work product privilege.  The Court finds that Wells Fargo has not established that the identification of Wells Fargo's UTPs or the factual information surrounding those UTPs falls under the work product privilege.

First, it is necessary to determine, based on the evidence presented, when and how Wells Fargo identified its UTPs.  The evidence supports Wells Fargo's claim that it identified its UTPs before it began its financial reporting analysis, in conjunction with formulating transactions aimed at tax benefits.  (*See, e.g.*, Horton Decl. ¶ 35; Wells Fargo Proposed Findings of Fact ¶ 100.)  Non-attorneys on Wells Fargo's staff were the first to identify UTPs and request the assistance of Wells Fargo's attorneys with respect to those positions.  (*See* Wells Fargo Proposed Findings of Fact ¶¶ 51, 54 ("The tax consequences of a transaction may be significant, and **therefore brought to the Tax Controversy Group for review**, [if the transaction is] (1) 'significant in the dollars involved'; (2) 'a very complex transaction'; and/or (3) a 'structured transaction,' to which the IRS gives heightened scrutiny." (emphasis added)).)  Once UTPs were identified, Wells Fargo's attorneys became involved in further analyzing the tax positions and, in conjunction with others at Wells Fargo, structuring the business transactions aimed at obtaining the

_____

[43] As noted above, work product protection can apply to testimony sought by an opposing party.  *See Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1328 (8th Cir. 1986) (holding that an attempt to depose an attorney about documents her client possessed was protected by the work product privilege, as this knowledge would reflect her judgment as an attorney in identifying, examining, and selecting from her client's voluminous files those documents on which she relied in preparing her client's defense).

identified tax benefits. Later, Wells Fargo's UTPs were listed in summarized form when Wells Fargo conducted its FIN 48 analysis; at that point, Wells Fargo drew on pre-existing knowledge and "it was not necessary for the Tax Controversy Group to engage in any additional legal research or evaluation of Wells Fargo's UTPs for financial reporting purposes." (*See* Wells Fargo Post-Trial Mem. at 13, Sept. 16, 2011, Docket No. 124.)

The Court finds that Wells Fargo's identification of UTPs around the time it entered into business transactions was not a task prepared in anticipation of litigation but rather an event that occurred in the ordinary course of business. *See Hickman*, 329 U.S. at 510 n.9 ("Reports . . . if made in the ordinary course of routine, are not privileged" (internal quotation marks omitted)). As a preliminary matter, the Court is not convinced that Wells Fargo's attorneys were, in fact, the first to identify UTPs. *See Arthur Young & Co.*, 465 U.S. at 808 (describing accountants preparing TAWs to assess a taxpayer's contingent tax liabilities, including identifying questionable positions the taxpayer may have taken on its tax return). But even assuming that Wells Fargo's attorneys identified these positions, when an attorney is acting "as a conduit for a client's funds, as a scrivener, or as a business advisor, the privilege does not apply." *See United States v. Spencer*, 2012 WL 5416151, at *2 (8th Cir. Nov. 7, 2012).[44] Here, the Court finds that

---

[44] *See also In re Prof'ls Direct Ins. Co.*, 578 F.3d 432, 439-40 (6th Cir. 2009); *United States v. Frederick*, 182 F.3d 496, 501 (7th Cir. 1999); *Davis*, 636 F.2d at 1043; *Lindley v. Life Investors Ins. Co. of Am.*, Nos. 08-CV-0379, 09-CV-0439, 2010 WL 1741407, at *4 (N.D. Okla. Apr. 28, 2010), *reconsideration denied*, 2010 WL 2541704 (N.D. Okla. Jun. 18, 2010); *Dunkin' Donuts Inc. v. Mary's Donuts, Inc.*, 206 F.R.D. 518, 520 (S.D. Fla. 2002) ("[T]he work product

(Footnote continued on next page.)

Wells Fargo's attorneys were acting more as business advisors helping to structure business transactions associated with tax positions than as attorneys offering legal advice or preparing for litigation.

Wells Fargo seems to claim that every time that it contemplated and entered into a transaction potentially controversial with the IRS, often well before its tax returns were filed or the IRS expressed concern about an issue, it anticipated and prepared for litigation. However, Wells Fargo also claimed that it would not enter into a transaction related to a UTP unless it had a seventy percent or greater certainty that the tax benefits stemming from its transactions would be upheld by a court of law. With this level of confidence, the Court finds it unlikely that Wells Fargo anticipated that the IRS would challenge – much less litigate – each UTP.[45] Furthermore, Wells Fargo and the IRS do

_____

(Footnote continued.)

privilege is not broad enough to prohibit all inquiry regarding information received from working with counsel. . . ."); *St. Paul Reinsurance Co. v. Commercial Fin. Corp.*, 197 F.R.D. 620, 637 (N.D. Iowa 2000); *Marvin Lumber & Cedar Co. v. PPG Indus., Inc.*, 168 F.R.D. 641, 646 (D. Minn. 1996) (holding that a company's investigation of a wood rot problem was not protected work product, even though the company's in-house attorneys were involved in the investigation, because it was an ordinary business activity); *Mission Nat'l Ins. Co. v. Lilly*, 112 F.R.D. 160, 164-65 (D. Minn. 1986) (refusing work product protection to investigations conducted by attorneys that were "routine business of an insurance company" (internal quotation marks omitted)).

[45] *See Schlicksup v. Caterpillar, Inc.*, No. 09-CV-1208, 2011 WL 4007670, at *7 (C.D. Ill. Sept. 9, 2011) ("Businesses must assess and plan for litigation risks as part of the ordinary course of their business and as part of complying with accounting requirements. While that planning may be literally 'because of the prospect of litigation,' the prospect itself is too generalized and uncertain to warrant work product protection."); *Onwuka v. Fed. Express Corp.*, 178 F.R.D. 508, 514 (D. Minn. 1997) (holding that it was insufficient to establish work product protection with respect to all employee complaints to assert that all employee grievances "are litigious by nature"); *McFadden v. Norton Co.*, 118 F.R.D. 625, 630 (D. Neb. 1988) (holding that in-house counsel's statement that receipt of notice of personal injury "almost always results in

(Footnote continued on next page.)

not litigate over every UTP.  Wells Fargo may be willing to resolve issues under some circumstances, assuming the IRS identifies and challenges an issue, and the IRS is also willing to resolve certain issues because its goal is to resolve disputes at the lowest possible level.  *See, e.g.*, *United States v. Baggot*, 463 U.S. 476, 480 (1983) ("[T]he purpose of the audit is not to prepare for or conduct litigation, but to assess the amount of tax liability through administrative channels.").  Thus, based on the totality of the evidence, the Court declines to find that Wells Fargo anticipated or prepared for litigation each time it identified its UTPs.[46]

It is difficult to pinpoint the moment when a hypothetical possibility of litigation in the future becomes "anticipation of litigation" for purposes of the work product doctrine.  At some point, Wells Fargo's work related to its UTPs "shift[ed] from the ordinary course of business to an anticipation of litigation."  *See U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, Nos. 97Civ.6124, 98Civ.3099, 2000 WL 744369, at *9 (S.D.N.Y. 2000).  "[T]here is no hard and fast rule as to when this occurs; rather, a fact-

_____

(Footnote continued.)

litigation" was insufficient to establish that party anticipated litigation on the claim at issue (internal quotation marks omitted)).

[46] Wells Fargo witnesses attempted to define UTPs as positions where Wells Fargo anticipated litigation.  (*See, e.g.*, Hager Tr. 360:18-361:2.)  The Court declines to adopt this self-serving definition of a UTP.  *See United States v. Textron Inc.*, 577 F.3d 21, 27 (1st Cir. 2009) (en banc) (declining to apply work product doctrine even though the taxpayer's witnesses "us[ed] the word 'litigation' as often as possible in their testimony").  Instead, for the reasons outlined, the Court finds that Wells Fargo's identification of UTPs involved "acknowledging the fact that there exist[ed] the possibility that a taxing authority could have a different interpretation of [a] particular tax position[.]"  (*See* Outslay Tr. 62:11-21.)

specific inquiry is required to determine when this shift occurs." *Id.* Wells Fargo has made no attempt to argue that it anticipated litigation regarding select UTPs as soon as they were identified; instead, it makes a far-reaching claim that it anticipated and prepared for litigation regarding all of its UTPs from the moment of their identification.[47] The Court is thus unable to conduct a fact-specific inquiry into each UTP to determine if Wells Fargo anticipated litigation at the time of its identification. *See id.* Wells Fargo has the burden of establishing the existence of the privilege; accordingly, the Court finds that Wells Fargo has not established that it was preparing for anticipated litigation when it identified its UTPs.

Wells Fargo might argue that its identification of UTPs is protected because it did not occur at the time that it entered into transactions but instead occurred when its attorneys conducted the FIN 48 analysis. Even if Wells Fargo had established this fact, which it did not, the identification of its UTPs would still not be protected. To be covered by the work product privilege, opinion work product must be "concerning the litigation" at issue. Fed. R. Civ. P. 26(b)(3)(B). Furthermore, ordinary work product must relate in some way to legal thinking connected to litigation. *See, e.g.*, *In re Chrysler*

---

[47] The Court notes that it would set troubling precedent to allow a taxpayer to make such sweeping assertions, far prior to any threat of litigation, simply because there is a history of some litigation between an agency and a company. To do so would potentially allow the non-disclosure of wide swaths of information, created long before litigation, that is conducted in the ordinary course of business before any specific threat of litigation becomes palpable. *See, e.g., WFC Holdings Corp.*, 2011 WL 4583817, at *32, *48 (finding, based largely on history of transaction beginning in the 1990s, that transaction entered into by Wells Fargo lacked economic substance or a real purpose other than tax avoidance); *Onwuka*, 178 F.R.D. at 513 (holding that the use of "work-product protections . . . to shroud otherwise discoverable corporate affairs in a veil of secrecy" is an "intolerable prospect").

*Motors Corp.*, 860 F.2d at 846; *Shelton v. Am. Motors Corp.*, 805 F.2d 1323, 1328 (8th Cir. 1986). The mere identification of which tax positions a company should analyze under FIN 48 is too far removed from any litigation to be protected work product or considered created "because of" litigation. *See Simon*, 816 F.2d at 401.[48] Instead, Wells Fargo listed its UTPs for FIN 48 as part of a regularly conducted business activity.[49] Thus, because the Court concludes that Wells Fargo's identification of its UTPs is not protected by the work product privilege, the Court will order that Wells Fargo and KPMG disclose Wells Fargo's identification of its UTPs, its process for identifying UTPs, and other factual information surrounding its UTPs.

### 2. Recognition and Measurement Analysis

Unlike Wells Fargo's identification of UTPs, Wells Fargo has established that the recognition and measurement analysis reflected in its TAWs was prepared in anticipated of litigation. Like the business documents in *Simon*, the TAWs themselves were not

---

[48] *Textron Inc.*, 577 F.3d at 28 ("[I]t is doubtful that tax accrual workpapers, which typically just identify . . . vulnerable return positions, would be useful in the litigation anticipated with respect to those positions." (internal quotation marks omitted)); *United States v. Adlman*, 134 F.3d 1194, 1195 (2d Cir. 1998) (classifying as work product "a document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions or theories **concerning the litigation**" (emphasis added)).

[49] As KPMG admitted, FIN 48 only requires the identification of **tax positions**, not UTPs. By stating that it only applies FIN 48 to "uncertain" tax positions, Wells Fargo has attempted to add an extra layer of judgment into the FIN 48 analysis. Nonetheless, the Court concludes that identifying tax positions under FIN 48 – whether called "tax positions" or UTPs – is a task required by financial reporting that has no necessary connection to whether litigation is ongoing or even likely. (*See, e.g.*, Outslay Tr. 82:22-83:2 (agreeing that "[e]ven a company with a 'zero percent expectation of litigation over a tax position' must recognize the position . . . .").)

prepared in anticipation of litigation.  *See Simon*, 816 F.2d at 401.  Rather, they were prepared to comply with Wells Fargo's financial reporting requirements.  *See, e.g.*, *Tronitech, Inc. v. NCR Corp.*, 108 F.R.D. 655, 656-57 (S.D. Ind. 1985) (distinguishing between audit letter regarding pending litigation and TAWs because TAWs are "not prepared for any pending or future litigation").  Nonetheless, the recognition and measurement analysis in Wells Fargo's TAWs was created in anticipation of litigation.

The Court has reviewed the TAWs at issue and concludes that the recognition and measurement analysis in them reflects the legal analysis conducted by Wells Fargo's attorneys in preparation of litigation.  Wells Fargo was actively participating in litigation or IRS Appeals on many of the UTPs and, for others, such litigation appeared likely.[50] The recognition and measurement analysis in the TAWs appears to have been created while Wells Fargo anticipated litigation, instead of created at the very beginning of transactions, because the analysis references items such as challenges by the IRS and developments in possible litigation.  Furthermore, this analysis appears to be pre-existing and not merely created for FIN 48; it includes settlement figures, the strengths and weaknesses of Wells Fargo's case, and assessments of Wells Fargo's chances of

---

[50] In contrast, the IRS examination process is not, in and of itself, litigation and will not necessarily lead to litigation.  *See, e.g.*, *Rupert v. United States*, 225 F.R.D. 154, 157 (M.D. Pa. 2004); *Peterson v. United States*, 52 F.R.D. 317, 320-21 (S.D. Ill. 1971).  As noted, above, although Agent Erickson testified that IRS examinations are "inherently adversarial," the Court finds that an IRS examination is not necessarily adversarial and that Wells Fargo has not shown that all tax positions will lead to litigation or be anticipated to lead to litigation.  However, Wells Fargo has established that it anticipated litigation in regard to each of the UTPs at issue because of the challenges surrounding them.

prevailing in litigation that were prepared in anticipation of litigation. *See Mead Corp. v. Riverwood Natural Res. Corp.*, 145 F.R.D. 512, 520 (D. Minn. 1992) ("Opinion work-product is material which contains or reveals an attorney's mental impressions, legal strategy, intended lines of proof, evaluation of strengths and weaknesses of the case, inferences drawn from interviews of witnesses, or similar matters.").

"[M]aterial developed in anticipation of litigation can be incorporated into a document produced during an audit without ceasing to be work product." *United States v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010). Allowing the IRS to access Wells Fargo's recognition and measurement analysis in the TAWs would provide a window into the legal thinking of Wells Fargo's attorneys on active litigation strategy, running counter to the purpose of the work product doctrine. *See Hickman*, 329 U.S. at 510-11.[51] Thus, like the individual case reserve data in *Simon*, information in Wells Fargo's TAWs regarding the recognition and measurement analysis is protected by the work product privilege. *See Simon*, 816 F.2d at 401.

The fact that Wells Fargo's Tax Accounting Group created many of the TAWs at issue does not alter the Court's decision. The recognition and measurement analysis in the TAWs reflects the legal thinking of Wells Fargo's attorneys on anticipated litigation

---

[51] Although the recognition analysis required Wells Fargo to **hypothesize** that each tax position be litigated to the United States Supreme Court, this analysis is still protected. Wells Fargo's assessments of the likelihood of success in litigation to the United States Supreme Court are closely related to its real-world assessments of success at other levels of litigation. Thus, Wells Fargo's estimates regarding its chances of prevailing reflect its real-world litigation assessments and strategies, not simply a hypothetical exercise conducted for the purposes of FIN 48.

and is therefore protected. *See id.* at 399, 401 (holding that documents "prepared by nonlawyer corporate officials" were protected from disclosure to the extent they contained individual case reserve figures prepared by lawyers). These attorneys' pre-existing thoughts, conclusions, and opinions about ongoing and likely litigation, later incorporated into the TAWs, are protected work product.

The Court cautions that this ruling is limited to the unique circumstances of Wells Fargo, a company that has substantially limited the number of tax positions that it subjected to a FIN 48 analysis and specifically proved its anticipation of litigation with regard to each of its UTPs at the time it created its TAWs. The Court does not adopt Wells Fargo and amicus curiae's argument that all TAWs, by their very nature, are created "because of" litigation simply because the taxpayer must "assume" under FIN 48 that positions will be litigated.[52] A hypothetical assumption that litigation will occur, even in cases where there might be little to no actual possibility of litigation, is not equivalent with **anticipating** litigation. *See Diversified Indus.*, 572 F.2d at 604 (explaining that "the work product rule does not . . . come into play" because an issue "might ultimately result in litigation of some sort in the future"). Nonetheless, the Court concludes, under these unique facts, that Wells Fargo's TAWs contain pre-existing legal judgments prepared in anticipation of litigation that are not discoverable.

_____

[52] In fact, in many circumstances, it may be appropriate for the IRS or other agencies to request a company's TAWs, where the taxpayer opines more obliquely – and cannot prove – that the material in its TAWs was prepared in anticipation of litigation. TAWs can, under some circumstances, be discovered by governmental agencies such as the SEC and IRS, as well as by the PCAOB. *See, e.g.*, 15 U.S.C. §§ 77s(c), 78u(b), 7215(b)(2)(B); *Arthur Young & Co.*, 465 U.S. at 820 & n.16.

### 3.    Work Product Created by KPMG

Wells Fargo seeks to protect not only TAWs that it created but also TAWs created by non-lawyers at KPMG. As explained above, *Simon* establishes that information closely related to an attorney's legal thinking about anticipated litigation is protected by the work product privilege even if it is disclosed within business documents drafted by non-lawyers. *Simon*, 816 F.2d at 401. Based upon the Court's review of KPMG's TAWs, the Court finds that KPMG's analysis of the recognition and measurement steps is closely tied to the analysis of Wells Fargo's attorneys. KPMG's TAWs test the analysis of Wells Fargo's attorneys, explicitly and implicitly; for example, the TAWs discuss whether Wells Fargo's reserves and assessments are reasonable. The Court thus concludes that KPMG's measurement and recognition analysis is protected by the work product privilege. As with Wells Fargo's TAWs, however, KPMG must disclose information about Wells Fargo's UTPs and the facts surrounding those UTPs.

### 4.    Extraordinary Circumstances

The Court must next address whether the IRS can overcome the work product privilege because of its need for the information requested in the summonses. As stated above, the TAWs, with the exception of the identification of the UTPs, reflect Wells Fargo's opinion work product; they include the mental impressions, conclusions, opinions, or legal theories of Wells Fargo's attorneys. *See In re Murphy*, 560 F.2d at 329 n.1. "[O]pinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances." *Id.* at 336. The Court finds that,

although the protected information in the TAWs may assist the IRS in its investigation of Wells Fargo's tax returns, the IRS has not shown any extraordinary circumstances requiring this information. In fact, Erickson stated that his primary interest in obtaining the information requested in the summons would be to identify Wells Fargo's UTPs, which would then allow the IRS to conduct its own analysis of these positions. No IRS witness explained why the IRS had a significant interest in obtaining the opinion work product in the TAWs. Accordingly, the Court finds that Wells Fargo's opinion work product, as defined above, is protected and not discoverable.

### 5.    Waiver of Privilege

The Court must finally determine if Wells Fargo waived the privilege by disclosing its work product to KPMG. "The work product privilege is not absolute and may be waived." *Pamida, Inc. v. E.S. Originals, Inc.*, 281 F.3d 726, 732 (8th Cir. 2002). A party waives the privilege when it intentionally discloses work product to its adversaries. *In re Chrysler Motors Corp.*, 860 F.2d at 846.[53] This rule holds true even when the party seeking the information is not the adversary to whom the initial disclosure was made; in other words, a waiver to one adversary is a waiver to all. *See id.* at 844-46 (allowing the United States access to work product, for the purposes of sentencing in a

---

[53] Work product privilege may also be waived when "the interests [of] fairness and consistency mandate a finding of waiver," such as when a party brings an action involving the issues it seeks to protect. *Pamida, Inc*, 281 F.3d at 732; *see also Monsanto Co. v. E.I. Du Pont De Nemours & Co.*, No. 4:09CV00686, 2011 WL 4408184, at *3 (E.D. Mo. Sept. 20, 2011) ("A so-called at-issue waiver may also occur where the client places the subject matter of the privileged communication at issue[.]" (internal quotation marks omitted)).

criminal case, where the work product had been turned over to plaintiffs in a civil class action).

As the Court will explain below, Wells Fargo did not waive its privilege through disclosure because (1) Eighth Circuit law requires that a party intend for its adversary to see the work product in order to waive the privilege; (2) KPMG is not an adversary; (3) Wells Fargo did not intend for an adversary to see its work product; and (4) Wells Fargo did not intend for a conduit to an adversary to see its work product.

### a.    Standard for Waiver

A critical question in this case is whether, under Eighth Circuit law, a party must **intend** for an adversary to see its work product in order to waive the privilege through disclosure.  The Eighth Circuit cases that speak most directly to this issue are *Pittman v. Frazer*, 129 F.3d 983, 988 (8th Cir. 1997), and *Gundacker v. Unisys Corporation*, 151 F.3d 842, 848 (8th Cir. 1998).  The Court will conclude, based on these cases, that a party must intend for an adversary to see its work product in order to waive the privilege through disclosure.

In *Pittman*, the Eighth Circuit addressed whether a railroad company waived work product privilege as to items in an investigator's file by voluntarily disclosing some photographs taken by the investigator.  129 F.3d at 987-88.  The Court held that there was no waiver of work product privilege as to the remaining items in the file because the railroad company merely used the photographs, which had already been disclosed to the

other side during discovery, as trial exhibits and because any waiver would only extend to the photographs themselves.  *Id.* at 988.  In reaching this holding, the Court stated:

> If documents otherwise protected by the work-product rule have been disclosed to others with an **actual intention** that an opposing party may see the documents, the party who made the disclosure should not subsequently be able to claim protection for the documents as work product.

*Id.* (quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2024 at 209 (1994)) (emphasis added).  Beyond this quotation, the Court engaged in no further discussion of an intentionality requirement.  *Id.*

A year after *Pittman*, the Eighth Circuit decided *Gundacker*, which addressed whether the inadvertent disclosure of a document waived the work product privilege.  151 F.3d at 848.  The Court held that the inadvertent disclosure did not waive the privilege. *Id.*  In reaching this holding, the Court cited *Pittman* and stated, "[a]lthough disclosure to an adversary ordinarily waives work product protection, **there must be an intention** that the opposing party see the work product."  *Id.* (emphasis added) (citing *Pittman*, 129 F.3d at 988).  The Court did not further discuss *Pittman* or an intentionality requirement; it simply concluded that "the district court did not abuse its discretion in finding that the document was privileged under the attorney work product doctrine."  *Id.*

Subsequent to these opinions, district courts have questioned whether Eighth Circuit precedent in fact dictates that waiver due to disclosure only exists when a party **intends** for an adversary to see its work product.  In *United States v. Johnson*, for example, the United States District Court for the Northern District of Iowa suggested that *Pittman* stated only that "an actual intention that an opposing party may see the

documents is **sufficient** to waive the work-product privilege, [but] it does not state that such an actual intention is **required**." 378 F. Supp. 2d 1041, 1046 (N.D. Iowa 2005) (emphasis in original) (internal quotation marks omitted). Accordingly, *Johnson* discounted *Gundacker*'s apparent adoption of an intentionality requirement. *Id.* at 1046-47.[54]

This Court declines to adopt the reasoning of *Johnson* and will instead follow *Gundacker*. It is possible, as *Johnson* notes, that *Gundacker*'s holding did not necessarily follow from *Pittman* in the way the *Gundacker* court suggested, but it is not this Court's role to second-guess the holdings of the Eighth Circuit. *See United States v. Foster*, 763 F. Supp. 2d 1086, 1088 (D. Minn. 2011) ("This Court must ordinarily follow Eighth Circuit precedent regardless of whether that precedent is, in this Court's opinion, correctly decided."). *Gundacker* clearly stated that, for disclosure to an adversary to waive work product protection, "there must be an intention that the opposing party see the work product." *Gundacker*, 151 F.3d at 848. This statement was not dicta but rather appears tied to the court's holding that the inadvertent disclosure of the document did not waive work product. The Court will thus apply this rule. *See, e.g.*, *St. Paul Reinsurance Co.*, 197 F.R.D. at 640 (citing *Gundacker* for the proposition that "waiver requires both disclosure to an adverse party and intention that the adverse party see the work product"). Because waiver by disclosure requires the intentional disclosure to an adverse party, this

---

[54] *See also BoDeans Cone Co., L.L.C. v. Norse Dairy Sys., L.L.C.*, 678 F. Supp. 2d 883, 892 (N.D. Iowa 2009).

Court must determine whether KPMG is an adversary and whether there was intentional disclosure to an adversary.

### b.    KPMG as Adversary

First, the Court concludes that KPMG is not an adversary.  There is no dispute that KPMG was not a litigation adversary of Wells Fargo at the time Wells Fargo provided its TAWs to KPMG.  In fact, the two companies have never been litigation adversaries.  Furthermore, there is no evidence that KPMG was in a non-litigation dispute with Wells Fargo.

The IRS argues instead that KPMG is a potential adversary.  *See, e.g.*, *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 687 (1ˢᵗ Cir. 1997) ("[D]isclosure to an adversary, real or potential, forfeits work product protection.").  It is not clear if the Eighth Circuit recognizes waiver stemming from disclosure to a **potential** adversary.  *See Gundacker*, 151 F.3d at 848 ("Although disclosure to an **adversary** ordinarily waives work product protection, there must be an intention that the opposing party see the work product." (emphasis added)).

Assuming that there is waiver for disclosure to a potential adversary, however, the Court finds that there was not a high enough risk of an adversarial relationship in this particular case to waive the privilege.  *See Deloitte LLP*, 610 F.3d at 140.  Wells Fargo presented evidence at trial, which the United States did not contradict, that litigation between auditors and their clients is rare.  Indeed, AICPA's Code of Professional Conduct states that an auditor's duty of independence may be impaired when there is a

potential of litigation between an auditor and its client, possibly leading to the auditor's need to withdraw as the client's auditor. KPMG has been Wells Fargo's outside financial statement auditor for well over twenty years, without a history of litigation or apparent conflict. Furthermore, Horton described Wells Fargo's relationship with KPMG as "cooperative and professional." The Court finds no indication – based on the evidence presented about KPMG or auditors in general – that there is likely to be litigation or other disputes between KPMG and Wells Fargo.[55]

### c.      Disclosure to Adversary

Second, because KPMG is not an adversary, Wells Fargo did not intentionally disclose its work product to an adversary. Newinski testified that KPMG has not disclosed any of Wells Fargo's or KPMG's 2007 or 2008 TAWs to any third party, and the United States has not disputed this point. KPMG took many steps to protect client confidentiality, such as providing training and locking confidential materials in a limited access room. Thus, because KPMG is not an adversary and because Wells Fargo has not disclosed its TAWs to any other party, Wells Fargo has not waived the privilege.

---

[55] The United States points to KPMG's promotion and approval of certain tax positions, later disallowed by courts, as points of potential conflict between KPMG and Wells Fargo. Because Wells Fargo has been a staunch defender of these positions in court, the Court finds it highly unlikely that Wells Fargo intends to litigate against KPMG regarding these tax positions. The United States has presented no evidence to the contrary.

#### d.    Conduit to Adversary

The United States argues that, even if KPMG is not an adversary, Wells Fargo waived the privilege because KPMG is a "conduit" to an adversary.  As a preliminary matter, the United States has cited to no Eighth Circuit cases establishing that waiver exists if a party discloses a document to a mere conduit to an adversary.  The Court will thus assume without deciding that the Eighth Circuit would recognize a waiver under these circumstances.

It is possible that, as the United States argues, there could be situations in which KPMG would be a conduit to an adversary.  The United States persuasively argues that there are situations where KPMG may be expected to disclose Wells Fargo's TAWs to the SEC or the PCAOB.  *See, e.g.*, 15 U.S.C. §§ 77s(c), 78u(b), 7215(b)(3), (c)(4); *Arthur Young & Co.*, 465 U.S. at 820; *Free Enter. Fund*, 130 S. Ct. at 3148.  In fact, Section 10A of the Securities Exchange Act of 1934 imposes an affirmative and absolute duty on independent auditors to make certain disclosures to the SEC regarding company violations of laws, rules, or regulations, which could include violations of the tax code. 15 U.S.C. § 78j-1(b)(3) & (4).  This understanding was reflected in KPMG's service agreement with Wells Fargo.  Given this evidence, it is possible that – presented with different evidence – this Court may have found that KPMG was a conduit to an adversary.

In this case, however, there is no evidence to establish that KPMG was a conduit to an adversary.  The United States has presented no evidence about how often auditors in general make disclosures to the SEC or other entities.  Furthermore, the United States

presented no evidence that KPMG in particular had ever made disclosures to adversaries. The evidence thus shows nothing more than a remote possibility of disclosure, which is insufficient to deem a party a conduit to an adversary. *See, e.g.*, *Johnson*, 378 F. Supp. 2d at 1047 ("[W]aiver occurs when the disclosure to a third party **substantially increases the likelihood that an adversary will come into possession of the material**." (emphasis in original)). Furthermore, the Eighth Circuit appears to require an **intention** that a document be disclosed to the adversary for the privilege to be waived, and no such intention was demonstrated here. *See Gundacker*, 151 F.3d at 848. The Court thus concludes, based on the evidence presented in this case, that KPMG is not an adversary, potential adversary, or conduit to an adversary and that there has been no waiver of the work product privilege.

### C.     Content that Wells Fargo Must Disclose

For the reasons outlined above, not all of the content of Wells Fargo's TAWs is protected by the work product privilege. Specifically, the Court holds that Wells Fargo must disclose the identity of its UTPs, the processes for identifying its UTPs, and some underlying facts surrounding those UTPs, but not Wells Fargo's recognition or measurement analysis.

In the sealed documents submitted to the Court, Wells Fargo has attempted to categorize its TAWs by category, through highlighting them in different colors according

to the topic they discuss.[56]  However, as noted above, some items categorized as "revealing the identity of uncertain tax positions" in fact have information that falls into other categories.  For example, one item in this category discusses the anticipated potential settlement of certain tax positions.  (*See* KPMG Sealed Document 78 at 8.) Accordingly, Wells Fargo's current categorization of material is an inadequate basis for this Court to delineate which material Wells Fargo must disclose.  Instead, the Court will order that Wells Fargo and KPMG disclose items in the TAWs according to the following directives.

The Court will order the disclosure of material in the TAWs that identifies: (1) Wells Fargo's federal UTPs, (2) facts underlying its federal UTPs (namely, the business transactions underlying the UTPs), and (3) Wells Fargo's process for identifying its federal UTPs.  Wells Fargo and KPMG will likewise be ordered to provide testimony, pursuant to the IRS testimonial summons, consistent with these categories of information. However, as explained above, this Order does not require Wells Fargo to disclose information that reveals the settlement analysis of Wells Fargo's attorneys, its attorneys' FIN 48 measurement and recognition analyses,[57] or its attorneys' assessments of its likelihood of pursuing or prevailing in a dispute with the IRS.

---

[56] As stated above, these topics are (1) information revealing the identity of UTPs; (2) information revealing recognition analysis under FIN 48; (3) information revealing measurement analysis under FIN 48; (4) irrelevant information related to state and local tax liability; (5) irrelevant information related to Wachovia tax liability; and (6) information revealing privileged attorney-client communications.

[57] By its FIN 48 measurement and recognition analyses, the Court means the analysis surrounding – as part of the FIN 48 analysis – whether it is more likely than not that the tax

(Footnote continued on next page.)

## IV.    ATTORNEY-CLIENT PRIVILEGE

The Court must next decide if certain of Wells Fargo's submitted documents are protected by attorney-client privilege. "A party asserting the attorney-client privilege . . . has the burden to provide a factual basis for the privilege or protection." *In re Zurn Pex Plumbing Prods. Liab. Litig.*, 2009 WL 1178588, at *1.

The federal common law of attorney-client privilege applies to this case because it is based on federal question jurisdiction. *See E.E.O.C. v. Woodmen of the World Life Ins. Soc'y*, No. 8:03CV165, 2007 WL 1544772, at *1-2 (D. Neb. Mar. 23, 2007). "Generally, it is well established under common law that confidential communications between an attorney and a client are privileged and not subject to disclosure absent consent of the client." *United States v. Horvath*, 731 F.2d 557, 562 (8th Cir. 1984). The attorney-client privilege applies to communications made by corporate employees to counsel to secure legal advice and to legal advice from corporate counsel to their clients. *PaineWebber Grp., Inc. v. Zinsmeyer Trusts P'ship*, 187 F.3d 988, 991 (8th Cir. 1999). The privilege is limited to circumstances in which communications are made for the purpose of legal

_____
(Footnote continued.)

benefit derived from the tax position will be sustained upon examination; the measurement of the largest amount of tax benefit that is greater than fifty percent likely of being realized upon ultimate settlement with a taxing authority; and the quantification, in regard to specific UTPs, of the monetary amount that Wells Fargo recorded as a reserve. This analysis would also include information about the units of account under FIN 48, which appears closely related to the recognition and measurement analysis and touches on how Wells Fargo anticipates that the IRS will analyze and challenge its tax positions. It also, of course, includes the above-described protected work product, such as Wells Fargo's discussions of settlement positions or KPMG's restatement and approval of Wells Fargo's settlement analysis.

advice.  *Olson v. United States*, 872 F.2d 820, 822 n.4 (8th Cir. 1989); *Diversified*, 572 F.2d at 609 (en banc).

Wells Fargo has asserted the attorney-client privilege as a basis for protecting eight documents from disclosure to the IRS.  (*See* Wells Fargo Trial Ex. 18 ¶¶ 1(c) and 3(b).)  At least one Wells Fargo in-house lawyer is a sender or recipient of each e-mail that Wells Fargo seeks to protect, and none were disclosed to KPMG or anyone else outside of Wells Fargo.

The Court will divide the allegedly privileged documents into three groups for the purposes of analyzing them.  First, three of the e-mails that Wells Fargo seeks to protect relate to drafts of TAWs.  (*See id.* ¶ 1(c).)  These e-mails identify UTPs and have drafts of UTP cover sheets, including recognition and measurement analyses, attached to them. The Court concludes that these e-mails and attachments are privileged because they include draft documents sent to counsel for the purposes of securing legal advice related to the recognition and measurement steps of FIN 48.  As explained above, Wells Fargo used pre-existing legal analysis and advice in completing its recognition and measurement analysis.

The United States argues that these e-mails are not protected by the attorney-client privilege because final drafts of the TAWs were eventually disclosed to KPMG. However, the disclosure of a final draft of a document does not erase attorney-client

privileges that attached to earlier versions of the document.[58]  The Court concludes that these drafts and e-mails are protected by the privilege because they were sent to Wells Fargo's attorneys for the purposes of accessing their pre-existing legal thinking about settlement strategy and other litigation issues.

Second, three of the allegedly privileged e-mails discuss the applicability of work-product protection and the attorney-client privilege to Wells Fargo's TAWs.  (*See* Wells Fargo Trial Ex. 18 ¶ 3(b)(i).)  These e-mails detail legal advice from Wells Fargo's attorneys regarding the applicability of the privileges and thus fall under attorney-client privilege.  *See PaineWebber Grp., Inc.*, 187 F.3d at 991 (stating that the privilege applies where a corporate client receives legal advice from its attorney).

Third, the last two e-mails discuss issues related to the settlement of UTPs.  (*See* Wells Fargo Trial Ex. 18 ¶ 3(b)(ii).)  These e-mails plainly include legal analysis related to anticipated litigation.  Accordingly, the Court finds that these e-mails are protected by the attorney-client privilege doctrine.[59]

---

[58] *See, e.g.*, *United States v. New York Metro. Transp. Auth.*, Nos. CV-2004-4237, 2006 WL 3833120, at *1 (E.D.N.Y. Dec. 29, 2006) ("Draft documents ultimately sent to third parties retain their privilege if they were prepared for the purpose of obtaining legal advice and/or contain information a client considered but decided not to include in the final version.") (internal quotation marks omitted); *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94 C 897, MDL No. 997, 1995 WL 557412, at *2 (N.D. Ill. Sept. 19, 1995) ("The mere fact that the final version of these documents may have been intended for public dissemination does not take them out from under the protection of the privilege, if the drafts of these documents were intended to be confidential communications concerning legal advice.").

[59] Furthermore, one of the e-mails is related to a state tax issue which, as the Court will discuss below, is not relevant.

The Court is troubled that one of the eight documents submitted by Wells Fargo for in camera review appears to contradict – or at least potentially contradict – trial testimony. (*See* Wells Fargo Sealed Document 28.) However, the Court finds that this fact is insufficient to overcome the privilege. In an Eighth Circuit case, *Baker v. General Motors Corp.*, plaintiffs argued that a defendant waived the attorney-client privilege because the defendant had "used witness testimony and made factual representations that were allegedly contrary to what the privileged documents w[ould] reveal." 209 F.3d 1051, 1055 (8th Cir. 2000). The Eighth Circuit rejected plaintiffs' argument, holding that both Michigan and Missouri courts rejected the extension of waiver to such circumstances. *Id. But see In re S. & E. Dist. Asbestos Litig.*, 730 F. Supp. 582, 585 (S.D.N.Y. 1990). Although the instant case does not involve the application of Michigan and Missouri law, the Court has found no cases suggesting that the Eighth Circuit would decide this issue differently under federal law.[60] Thus, the Court finds that all eight of Wells Fargo's documents are protected by the attorney-client privilege.

## V. STATE AND LOCAL TAWs

The Court must next decide if the IRS may summons TAWs related to Wells Fargo's state and local tax UTPs. (*See* Wells Fargo Trial Ex. 18 ¶¶ 4, 5(4), and 6(b).)

---

[60] Furthermore, the Court notes that Wells Fargo's seemingly inconsistent document does not appear to fit neatly into either situation that commonly allows for "at issue" waiver: (1) "when proof of a party's legal contention implicates evidence encompassed in the contents of an attorney-client communication – for example, when a client uses reliance on legal advice as a defense or when a client brings a legal malpractice action," or (2) "when a client's testimony refers to a specific privileged document." *See Baker*, 209 F.3d at 1055.

The United States argues that state and local TAWs are potentially relevant to identifying inconsistencies in positions that Wells Fargo takes in its federal, as opposed to state and local, tax returns.

Under *Powell*, the IRS must make a prima facie case that the information it seeks in an audit "may be relevant" to a "legitimate" investigative purpose. *Powell*, 379 U.S. at 57. The relevance standard is a broad one; the Court need determine "merely . . . that [the state and local TAWs] might shed some light on the tax return." *See Norwest Corp.*, 116 F.3d at 1233. "The IRS need not state with certainty how useful, if at all, the summoned material will in fact turn out to be." *Id.* In addition, "it is for the agency, and not the taxpayer, to determine the course and conduct of an audit, and the judiciary should not go beyond the requirements of the statute and force IRS to litigate the reasonableness of its investigative procedures." *Id.* (internal quotation marks omitted); *see also United States v. U.S. Bancorp*, 12 F. Supp. 2d 982, 985 (D. Minn. 1998). On the other hand, the information sought must meet some basic threshold of relevance because the United States must make a prima facie case that the information it seeks is potentially relevant. *See Powell,* 379 U.S. at 57-58.

The Court finds that the United States has not made a prima facie case that the state and local TAWs are even potentially relevant. Erickson asserted, without further explanation, that information about state and local taxes may reveal inconsistencies in positions Wells Fargo takes in its federal, as opposed to state and local, tax returns. However, the United States has not given any examples of such a potential inconsistency.

The United States argues that it does not need to provide an example of a potential inconsistency because the IRS need not accept the summoned party's word as to what records are relevant to its examination; rather, the IRS is entitled to determine relevance for itself. *See Tiffany Fine Arts*, 469 U.S. at 323; *United States v. Bisceglia*, 420 U.S. 141, 146 (1975) ("The purpose of the [summons] statutes is not to accuse, but to inquire."). It is accurate that the United States need not accuse Wells Fargo of a particular inconsistency or identify the precise relevance of the state or local TAWs. However, the Court finds it inadequate to simply allege that there could be possible "inconsistencies" without giving a single example of when such an inconsistency has been identified from TAWs in the past or when an inconsistency could theoretically be identified in the future. Indeed, the IRS's own witness, Biafore, admitted that state and local TAWs were irrelevant with respect to a taxpayer such as Wells Fargo, which deducts state and local taxes based on the amount of taxes paid.

The Court does not decide whether state or local taxes could ever be relevant to a federal tax return or even whether Wells Fargo's particular state and local TAWs could be relevant. However, based on the evidence presented, the United States has not articulated a prima facie case that the state and local TAWs may be relevant. *See Powell*, 379 U.S. at 57.[61] Accordingly, Wells Fargo need not disclose these TAWs to the IRS.

---

[61] Wells Fargo considers the California franchise tax to be a federal tax position, so this position does not support the relevance of state or local TAWs.

## VI.   WACHOVIA TAWs

Finally, Wells Fargo argues that its TAWs relating to Wachovia's tax liability are irrelevant.  (*See* Wells Fargo Trial Ex. 18 ¶ 5(6).)  Wells Fargo's acquisition of Wachovia closed on December 31, 2008, and Wachovia filed its own separate consolidated federal income tax returns for 2007 and 2008.  The United States provided no explanation as to why Wachovia's TAWs are relevant and, as with the state and local TAWs, has not met its burden to show that Wachovia's TAWs are relevant.  Indeed, the Court has not identified any evidence to rebut Wells Fargo's claim that Wachovia's TAWs are irrelevant to Wells Fargo's federal tax liability.  Because the United States has failed to state a prima facie case in support of the disclosure of Wachovia's TAWs, Wells Fargo need not disclose them.

## VII.   CONCLUSION

The Court concludes that, with the exception of the state, local, and Wachovia TAWs, the United States has established the *Powell* prima facie factors that support its summonses.  However, Wells Fargo has shown that the enforcement of the summonses would represent an abuse of the court's enforcement powers in certain respects because much, but not all, of the material sought by the summonses is protected by the work product doctrine.  The Court further concludes that eight of the documents sought by the United States are protected by attorney-client privilege.

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Wells Fargo's Petition to Quash the IRS Summons [Docket No. 1, Misc. No. 10-57] and the United States's Countermotion to Enforce the IRS Summons [Docket No. 7, Misc. No. 10-57] are **GRANTED in part** and **DENIED in part**, as follows:

    a.    KPMG shall provide copies of documents in its possession listed under categories 1(a-b), 2(a-b), 3(a, c), 5(1a-3a), 5(5), and 6(a) on Wells Fargo Trial Exhibit 18 to the Internal Revenue Service within sixty (60) days of the filing date of this Order, subject to the condition that these documents may be redacted to provide only the following information, as detailed further in the memorandum above:

        (1)  The identification of Wells Fargo's federal UTPs,

        (2)  Historical facts underlying Wells Fargo's federal UTPs, and

        (3)  Wells Fargo's process for identifying its federal UTPs.

    b.    KPMG is directed to obey the summonses for testimony issued by the IRS by providing testimony before Revenue Agent Erickson, or any other proper officer or employee of the IRS, at such time and place as may be set by Revenue Agent Erickson, or any other proper officer or employee of the IRS.  This testimony will be limited to:

        (1)  The identification of Wells Fargo's federal UTPs,

        (2)  Historical facts underlying Wells Fargo's federal UTPs,

        (3)  Wells Fargo's process for identifying its federal UTPs, and

       (4)   Other opinions and materials generated by accountants at KPMG regarding the UTPs, as well as the opinions and materials generated by any other non-lawyer, unless this information incorporates the legal analysis of Wells Fargo's attorneys.

   c.      The motions are otherwise **DENIED** in all other respects.

2.    The United States's petition to enforce the IRS summonses [Docket No. 1, Misc. No. 10-95] is **GRANTED in part** as follows:

   a.      Wells Fargo shall provide copies of documents in its possession listed under categories 1(a-b), 2(a-b), 3(a, c), 5(1a-3a), 5(5), and 6(a) on Wells Fargo Trial Exhibit 18 to the Internal Revenue Service within sixty (60) days of the filing date of this Order, subject to the condition that these documents may be redacted to provide only the following information, as detailed further in the memorandum above:

       (1)   The identification of Wells Fargo's federal UTPs,
       (2)  Historical facts underlying Wells Fargo's federal UTPs, and
       (3)  Wells Fargo's process for identifying its federal UTPs.

   b.      Wells Fargo is directed to obey the summonses for testimony issued by the IRS by providing testimony before Revenue Agent Erickson, or any other proper officer or employee of the IRS, at such time and place as may be set by Revenue Agent Erickson, or any other proper officer or employee of the IRS. This testimony will be limited to:

       (1)  The identification of Wells Fargo's federal UTPs,
       (2)  Historical facts underlying Wells Fargo's federal UTPs,
       (3)  Wells Fargo's process for identifying its federal UTPs, and

(4) Other opinions and materials generated by accountants at KPMG regarding the UTPs, as well as the opinions and materials generated by any other non-lawyer, unless this information incorporates the legal analysis of Wells Fargo's attorneys.

c.    The United States's motion is otherwise **DENIED**.

3.    The parties shall bear their own costs.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  June 4, 2013
at Minneapolis, Minnesota.

s/ John R. Tunheim

JOHN R. TUNHEIM
United States District Judge